JAYMIE PARKKINEN (S.B. #318394)
808 Wilshire Blvd., Suite 200-255
Santa Monica, California 90401
Telephone:   (323) 919-3590
Email:       jp@prkknn.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

MAREN FLAGG,

       Plaintiff,

   v.

TAYLOR SWIFT, et al.,

       Defendants.

Case No. 2:26-cv-03354-SRM-BFM

Assigned to Hon. Serena R. Murillo

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION**

Date:    May 27, 2026
Time:    1:30 p.m.
Place:   Courtroom 5D (5th Fl.)
          350 W. First Street
          Los Angeles, CA 90012

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 27, 2026, at 1:30 p.m., or as soon as the matter may be heard, in the courtroom of the Honorable Serena R. Murillo at the United States District Court for the Central District of California, First Street U.S. Courthouse, Courtroom 5D, 350 W. First Street, Los Angeles, California 90012, Plaintiff Maren Flagg, professionally known as Maren Wade ("Plaintiff") will, and hereby does, move the Court for a preliminary injunction against Defendants Taylor Swift ("Swift"), TAS Rights Management, LLC ("TAS"), UMG Recordings, Inc. ("UMG"), and Bravado International Group Merchandising Services Inc. ("Bravado" and collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-1.

As detailed in the Proposed Order submitted with this Motion, Plaintiff seeks an order enjoining Defendants, together with their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, during the pendency of this litigation from using THE LIFE OF A SHOWGIRL as a trademark or source-identifying designation in connection with any goods or services within the classes of goods and services identified to the United States Patent and Trademark Office ("USPTO") in Defendants' U.S. Trademark Application Serial No. 99331566, including but not limited to merchandise, consumer goods, and entertainment services, pending final resolution of this matter.[1]

This Motion is made on the grounds that: (1) Plaintiff is likely to succeed on the merits of her claims or, at minimum, her claims raise serious questions going to the merits; (2) Plaintiff will suffer irreparable harm if Defendants are not enjoined; (3) the balance of equities tips sharply in Plaintiff's favor; and (4) the public interest favors the issuance of a preliminary injunction.

This Motion is based on this Notice of Motion and Motion, the attached

---

[1] Nothing in this Motion, including any limitation on the scope of preliminary relief sought, constitutes a waiver of Plaintiff's right to seek broader relief at any subsequent stage of this litigation.

P'S MOT. FOR PRELIM. INJ.

Memorandum of Points and Authorities, Plaintiff's Complaint, the Declaration of Maren Flagg, the Declaration of Jaymie Parkkinen and associated exhibits, all matters of which the Court may take judicial notice, all other pleadings on file in this action, and any further written or oral argument or evidence as Plaintiff may present to the Court.

Although not required by Local Rule 7-3 or the Court's Standing Order for applications under Federal Rule of Civil Procedure 65, Plaintiff's counsel contacted counsel for Swift and TAS on March 30, 2026, to discuss potential resolution of these matters without judicial intervention. Parkkinen Decl. ¶ 41. Those discussions were not successful. *Id.*

DATED: April 7, 2026                                Respectfully submitted,

                                            */s/ Jaymie Parkkinen*
                                          Jaymie Parkkinen

                                          *Counsel for Plaintiff*

# TABLE OF CONTENTS

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................9

INTRODUCTION.................................................................................................9

STATEMENT OF FACTS....................................................................................10

LEGAL STANDARD ...........................................................................................11

ARGUMENT .......................................................................................................12

    I. THE *ROGERS* TEST DOES NOT APPLY HERE .......................................12

    II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS .....................15

        A.  Similarity of the Marks—Favors Plaintiff................................15

        B.  Proximity of Goods and Services—Favors Plaintiff.............................18

        C.  Strength of the Marks—Favors Plaintiff....................................20

        D.  Evidence of Actual Confusion—Favors Plaintiff.......................21

        E.  Marketing Channels Used—Favors Plaintiff ..........................................23

        F.  Degree of Consumer Care—Favors Plaintiff ..........................................23

        G.  Defendants' Intent—Favors Plaintiff........................................24

        H.  The Likelihood of Expansion—Favors Plaintiff.................................25

    III. PLAINTIFF IS LIKELY TO SUFFER IRREPARABLE HARM .............26

    IV. THE BALANCE OF EQUITIES FAVORS PLAINTIFF .........................28

        A.  The Harm to Plaintiff Absent Relief Is Existential ..............................28

        B.  The Burden on Defendants Is Self-Inflicted and Manageable ..............29

        C.  Bond ...................................................................................30

    V. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST ..30

CONCLUSION .................................................................................................31

CERTIFICATE OF COMPLIANCE ....................................................................32

P'S MOT. FOR PRELIM. INJ.

## **TABLE OF AUTHORITIES**

**CASES**

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
237 F.3d 198 (3d Cir. 2000)...................................................................21

*Activision Publ'g, Inc. v. Warzone.com, LLC*,
2024 WL 6467326 (C.D. Cal. Apr. 11, 2024)......................................13

*Adidas Am., Inc. v. Skechers USA, Inc.*,
890 F.3d 747 (9th Cir. 2018)................................................................28

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)........................................................12, 26

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979)..............................................15, 18, 23, 25

*Belin v. Starz Ent., LLC*,
2024 WL 4720795 (C.D. Cal. Sep. 20, 2024).....................................13

*Boldface Licensing + Branding v. By Lee Tillett, Inc.*,
940 F. Supp. 2d 1178 (C.D. Cal. 2013)...............................................28

*Brookfield Communs., Inc. v. W. Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999)............................................19, 23, 25, 31

*Cadence Design Sys. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997)...............................................................29

*Concord Music Grp., Inc. v. Stax. Pty Ltd.*,
2023 WL 2977495 (C.D. Cal. Apr. 6, 2023)...................................25, 27

*CytoSport, Inc. v. Vital Pharms., Inc.*,
617 F. Supp. 2d 1051 (E.D. Cal. 2009)................................................20

*Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*,
2026 WL 252491 (C.D. Cal. Jan. 20, 2026) ........................................13

*El Pollo Loco, Inc. v. MIK Food Inc.*,
2021 WL 6104875 (C.D. Cal. Nov. 1, 2021)........................................30

*Entrepreneur Media v. Smith*,
279 F.3d 1135 (9th Cir. 2002)..........................................17, 18, 21

P'S MOT. FOR PRELIM. INJ.

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000)................................................................................24

*Grocery Outlet, Inc. v. Albertson's, Inc.*,
    497 F.3d 949 (9th Cir. 2007)..................................................................................15

*Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*,
    425 F.3d 708 (9th Cir. 2005)..................................................................................30

*In re Detroit Ath. Co.*,
    903 F.3d 1297 (Fed. Cir. 2018)........................................................................17, 18

*In re Nat'l Data Corp.*,
    753 F.2d 1056 (Fed. Cir. 1985)........................................................................16, 17

*InSinKerator, Ltd. Liab. Co. v. Joneca Co., Ltd. Liab. Co.*,
    163 F.4th 608 (9th Cir. 2025)..........................................................................12, 26

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
    2 F.4th 1150 (9th Cir. 2021)..........................................................................*passim*

*Iyo, Inc. v. Io Prods., Inc.*,
    2025 WL 3471705 (9th Cir. Dec. 3, 2025) ...............................................20, 21, 23

*Jack Daniel's Properties, Inc. v. VIP Products LLC*,
    599 U.S. 140 (2023) .................................................................................12, 14, 15

*JL Bev. Co., LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016)........................................................................20, 24

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003)..................................................................................30

*Marketquest Group, Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017)..................................................................................24

*Network Automation, Inc. v. Advanced Sys. Concepts*,
    638 F.3d 1137 (9th Cir. 2011)................................................................................16

*Pom Wonderful Ltd. Liab. Co. v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014)........................................................................15, 23

*Punchbowl, Inc. v. Aj Press, Ltd. Liab. Co.*,
    90 F.4th 1022 (9th Cir. 2024)....................................................................12, 13, 15

P'S MOT. FOR PRELIM. INJ.

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012)..................................................................................19, 23

*Regents of Univ. of Cal. v. Am. Broad. Cos.*,
747 F.2d 511 (9th Cir. 1984)...................................................................................27

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989)....................................................................................12

*Sajahtera, Inc. v. Kitross Apparel L.A., LLC*,
   2024 WL 3086551 (C.D. Cal. June 10, 2024) ....................................................*passim*

*Sardi's Restaurant Corp. v. Sardie*,
   755 F.2d 719 (9th Cir. 1985).................................................................................28

*Toho Co., Ltd. v. William Morrow & Co.*,
   33 F. Supp. 2d 1206 (C.D. Cal. 1998)...................................................................24

*UA Corp. v. United Artist Studios LLC*,
   2020 WL 4369778 (C.D. Cal. July 7, 2020) .........................................................18

*Vital Pharms. v. PHD Mktg.*,
   2021 WL 6881866 (C.D. Cal. Mar. 12, 2021) ......................................................26

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*,
   758 F.3d 1069 (9th Cir. 2014).................................................................................21

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................................12, 28

*Yuga Labs, Inc. v. Ripps*,
   144 F.4th 1137 (9th Cir. 2025)..............................................................................15

**STATUTES**

15 U.S.C. § 1072 ......................................................................................................24

15 U.S.C. § 1114 ......................................................................................................22

15 U.S.C. § 1115 ......................................................................................................15

15 U.S.C. § 1116 ..........................................................................................12, 26, 30

15 U.S.C. § 1125 ......................................................................................................22

Trademark Modernization Act of 2020,
   Pub. L. No. 116-260, § 226, 134 Stat. 1182, 2208 (2020)..................................26

P'S MOT. FOR PRELIM. INJ.

**RULES**

Fed. R. Civ. P. 65 ................................................................................2, 30

**OTHER AUTHORITIES**

Gilson on Trademarks § 3.02 .......................................................................24

*Karapapa & Borghi, Search Engine Liability for Autocomplete Suggestions*,
    23 Int. J.L. & Info. Tech. 261 (2015)......................................................22

McCarthy on Trademarks and Unfair Competition § 30:51 (5th ed.)........................29

P's Mot. For Prelim. Inj.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In 2014, Plaintiff began writing a column in *Las Vegas Weekly* about life as a working performer—the indignities, the absurdities, the giant birthday cakes you get trapped inside—and called it CONFESSIONS OF A SHOWGIRL. Over twelve years, she built the brand into a live show, a touring production, a book, a podcast, and a federally registered, incontestable trademark. For more than a decade, the mark identified a single source. A search for it returned one person.

Then, in August 2025, Defendants adopted THE LIFE OF A SHOWGIRL. Within weeks, the name appeared on drink tumblers, candles, hairbrushes, and garment tags. Defendants built a dedicated retail storefront around it, launched collaborations with numerous national brands, and filed a trademark application across fourteen international classes, covering everything from disposable napkins to ponchos. They never contacted Plaintiff. They never sought her consent.

Before they chose that name, they had every reason—and every resource—to know better. For a global commercial enterprise like Defendants', searching the federal register for conflicts before adopting a new mark is not an extraordinary precaution. It is the baseline. A single search here would have returned Plaintiff's registration.

If Defendants missed it, the USPTO did not. On November 5, 2025, the Office refused to register THE LIFE OF A SHOWGIRL, finding it confusingly similar to Plaintiff's mark and citing her registration by name and number. But Defendants did not withdraw the application. They did not modify the mark. They simply continued selling goods under the very designation the Office had flagged.

The confusion the USPTO predicted has materialized. Consumers refer to Defendants' album by Plaintiff's mark. They use Plaintiff's trademark as a hashtag for Defendants' products. Eight of ten Google autocomplete results for Plaintiff's exact registered mark now redirect to Defendants, and that same search on YouTube returns nine consecutive hits for Defendants before a single result for Plaintiff. This is textbook

reverse confusion where a junior user's commercial dominance systematically displaces the senior user's mark in the mind of the public until consumers come to believe the originator is the imitator.

This Motion does not ask the Court to break new ground. Plaintiff is a senior trademark holder whose registered, incontestable mark is being infringed by the very designation the USPTO refused to register—citing Plaintiff's mark as the basis for refusal. In bringing this Motion, Plaintiff has simply followed the lead of the federal agency charged with evaluating exactly this question—and followed Defendants' lead as well. Defendants are among trademark law's most prolific enforcers, having filed multiple federal actions claiming irreparable harm when others infringe their marks, and obtained injunctive relief on exactly that basis. The same principles should apply here. Plaintiff seeks a preliminary injunction to preserve her brand while this case proceeds to resolution.

## STATEMENT OF FACTS

Plaintiff owns U.S. Trademark Registration No. 4800625 for CONFESSIONS OF A SHOWGIRL, registered in 2015 for entertainment services. Ex. 1 at 2.[2] The registration has achieved incontestable status under federal law. *Id*. at 5. Plaintiff has used the mark continuously since 2014, performing her show at venues across the country and expanding the brand into television, a book, a podcast, and digital content. Plaintiff Decl. ¶¶ 3-4.

In August 2025, Defendants adopted THE LIFE OF A SHOWGIRL. Ex. 2 at 2. What followed was not a single album release but a coordinated commercial rollout: a branded retail storefront, individual product names incorporating the designation, garment labels and product tags bearing it, and collaborations with national brands. Dkt. 1 ¶¶ 44-47; Exs. 6-9. Defendants, through TAS, simultaneously filed a trademark application seeking registration of the designation across more than a dozen international classes covering not only musical recordings and live entertainment, but

---

[2] All citations to "Ex." are to the Parkkinen Declaration, unless stated otherwise.

P'S MOT. FOR PRELIM. INJ.

consumer goods ranging from candles and drinkware to Christmas tree skirts and disposable plates. Ex. 2; Ex. 5.

On November 5, 2025, the USPTO refused registration, finding THE LIFE OF A SHOWGIRL confusingly similar to Plaintiff's mark. Ex. 3 at 3-8. Defendants did not withdraw the application or modify the designation, nor contact Plaintiff to reach an accommodation of the conflict. Exs. 6-7; Plaintiff Decl. ¶ 8. Instead, on March 3, 2026, at Defendants' request, Ex. 4 at 2-3, the USPTO suspended the application, Ex. 5 at 2, while Defendants continued to sell goods under the very mark the Office had flagged, Exs. 6-9.

Plaintiff did not rush to litigation. She permitted the USPTO proceeding to run its course, afforded Defendants a reasonable window to conform their conduct to the Office's finding, and watched them do the opposite. Plaintiff Decl. ¶¶ 7, 9. She retained litigation counsel, filed suit on March 30, 2026, and now moves for preliminary relief. *Id*. ¶ 9; Dkt. 1.

The confusion the USPTO predicted when refusing Defendants' application has materialized. Consumers have referred to Defendants' album by Plaintiff's mark, Exs. 16-17, 19-22, 31-32, used Plaintiff's mark as a hashtag when discussing Defendants' products, Exs. 23, 25, 27, 29, and treated the two designations as interchangeable—all within the brief period of concurrent use. Plaintiff's brand has been progressively displaced in the channels through which she reaches her audience: eight of ten Google autocomplete suggestions for her exact registered mark now direct consumers toward Defendants, Ex. 34 at 2, and on YouTube, nine consecutive results for Defendants appear before a single result for Plaintiff, Ex. 36 at 2-4. That displacement deepens with each day Defendants' program continues. This motion seeks to enjoin it.

## <u>LEGAL STANDARD</u>

A plaintiff seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that an

P'S MOT. FOR PRELIM. INJ.

injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, a plaintiff may obtain relief by raising "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff[.]" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

In trademark cases, a showing of likelihood of confusion establishes a presumption of irreparable harm. 15 U.S.C. § 1116(a); *InSinKerator, Ltd. Liab. Co. v. Joneca Co., Ltd. Liab. Co.*, 163 F.4th 608, 622 (9th Cir. 2025).

## ARGUMENT

## I.    THE *ROGERS* TEST DOES NOT APPLY HERE

Defendants will likely contend that THE LIFE OF A SHOWGIRL, as the title of a musical work, constitutes protected expression exempt from trademark liability under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).[3] The argument fails at the threshold and Defendants' own filings foreclose it.

The Supreme Court in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, made clear that *Rogers* "has always been a cabined doctrine" and "does not" apply "when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods." 599 U.S. 140, 153, 155 (2023). That holding applies even when "the use of a mark has other expressive content[.]" *Id.* at 157. The Ninth Circuit applied this holding in *Punchbowl,* reversing its own prior decision and holding that *Rogers* is foreclosed where the defendant uses a mark to "identify and distinguish" its products. 90 F.4th at 1031. A trademark application is itself "straightforward" evidence of source-identifying use. *Id*.

District courts in this Circuit have followed suit. In *Diece-Lisa Industries, Inc. v. Disney Enterprises, Inc.*, a reverse confusion case, the court held *Rogers* "no longer

---

[3] Defendants bear the burden to show their mark is "an expressive work entitled to protection under the First Amendment." *Sajahtera, Inc. v. Kitross Apparel L.A., LLC*, 2024 WL 3086551, 2024 U.S. Dist. LEXIS 113163, at *7 (C.D. Cal. June 10, 2024); *Punchbowl, Inc. v. Aj Press, Ltd. Liab. Co.*, 90 F.4th 1022, 1028 (9th Cir. 2024).

P'S MOT. FOR PRELIM. INJ.

applicable" where Disney used a modified version of the plaintiff's registered mark as a character name in *Toy Story 3* and then deployed that name to sell consumer goods. 2026 WL 252491, 2026 U.S. Dist. LEXIS 20771, at *9 (C.D. Cal. Jan. 20, 2026). That the mark originated in an expressive work was immaterial. The dispositive question was whether Disney used it, at least in part, to designate source (it did). *Id*. at *14.[4]

The question, then, is whether Defendants use THE LIFE OF A SHOWGIRL as a source identifier. Their own trademark application answers it.

***Defendants' trademark application.*** Defendants filed U.S. Trademark Application Serial No. 99331566, seeking registration of THE LIFE OF A SHOWGIRL across fourteen international classes. Ex. 2 at 2-5; Ex. 5 at 2-3. The application does not cover only consumer merchandise. It covers the songs and the album. Ex. 2 at 2-3 (Class 9: "musical sound recordings," "pre-recorded vinyl records featuring music," "video recordings featuring music and musical entertainment."); Ex. 5 at 2. It covers the concerts. Ex. 2 at 4-5 (Class 41: "entertainment services in the nature of live musical performances," "theatrical shows provided at performance venues."); Ex. 5 at 3. And it covers much more. Ex. 2 at 2-4 (Classes 4, 14, 15, 16, 18, 20, 21, 24, 25, 26, 28, 35: candles, drinkware, aprons, hairbrushes, puzzles, Christmas tree skirts, stuffed toys); Ex. 5 at 2-3.

Defendants have thus represented to the federal government that THE LIFE OF A SHOWGIRL functions as a trademark for the recordings, for the performances, and for every category of consumer goods they sell under the name. A trademark application is "straightforward" evidence that the applicant uses the designation to "identify and distinguish" its products. *Punchbowl*, 90 F.4th at 1031.

---

[4] *See also Activision Publ'g, Inc. v. Warzone.com, LLC*, 2024 WL 6467326, 2024 U.S. Dist. LEXIS 66820, at *9 (C.D. Cal. Apr. 11, 2024) (trademark application "confirm[s]" intent to use a word as a trademark); *Belin v. Starz Ent., LLC*, 2024 WL 4720795, 2024 U.S. Dist. LEXIS 204658, at *13-14 (C.D. Cal. Sep. 20, 2024) (trademark application and use forecloses *Rogers*).

P'S MOT. FOR PRELIM. INJ.

This is not an isolated filing. It is Defendants' business model. TAS manages more than 170 active or pending trademark registrations on behalf of Swift. Ex. 10 at 2-8. Defendants have sought registration for virtually every album release, built branded merchandise programs around each one, and operated dedicated retail storefronts to sell goods under those designations. *Id*.; Ex. 6 at 2; Ex. 37 at 8 (¶ 25), 30. They treat each album title as a commercial brand because that is what it is. Ex. 37 at 8 (¶ 25), 30. Having claimed THE LIFE OF A SHOWGIRL as a source identifier for musical recordings and live performances before the USPTO, Defendants cannot disclaim that characterization before this Court.

***Defendants' product names and labeling.*** The evidence corroborates what the application already establishes. Defendants operate a dedicated retail webpage labeled "THE LIFE OF A SHOWGIRL SHOP"—not as an act of creative expression, but as a retail channel deploying the designation to sell a coordinated line of consumer goods. Ex. 6 at 2; Ex. 9 at 2. Within that storefront, Defendants use the designation as part of individual product names—"The Life of a Showgirl Tumbler," "The Life of a Showgirl Hairbrush," "The Life of a Showgirl Candle." Ex. 6 at 5; Ex. 9 at 2-3. Defendants further affix the designation to product labels and interior garment tags in the positions customarily reserved for source identification. Ex. 7 at 4; Ex. 8 at 2-3; *see also Jack Daniel's*, 599 U.S. at 160 (placement of mark on hangtag serves "source-identifying function"). At every level of the retail operation—the storefront, the product name, the label inside the garment—the designation is doing the work of a trademark.

***Defendants' own litigation history.*** Swift and TAS have repeatedly filed federal actions seeking injunctions and seizure orders against the sale of merchandise bearing Swift-associated designations near concert venues, taking the position that such designations function as trademarks when affixed to consumer goods and obtaining federal court orders on that basis. *See, e.g.,* Ex. 37 at 6 (¶ 18), 12 (¶¶ 28-29), 14 (¶ 36), 15 (¶ 41). Defendants cannot maintain that position when enforcing their own rights and disclaim it when defending against the rights of others. *See Jack Daniel's*, 599 U.S.

P'S MOT. FOR PRELIM. INJ.

at 160 (defendant's history of claiming trademark protection for other products in the same line was evidence that the accused mark was likewise being used "to identify product source").

Under *Jack Daniel's* and its progeny, when a designation is used "at least in part for source identification," *Rogers* does not apply. 599 U.S. at 156 (internal quotation marks omitted); *Yuga Labs, Inc. v. Ripps*, 144 F.4th 1137, 1166-67 (9th Cir. 2025). Defendants have used THE LIFE OF A SHOWGIRL as a source identifier across every commercial category in which they operate and have represented as much to the federal government. Defendants must therefore "meet the infringement claim on the usual battleground of likelihood of confusion." *Punchbowl*, 90 F.4th at 1032 (cleaned up).

## II.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

To establish trademark infringement, Plaintiff must show that she is "(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark." *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007). The first element is undisputed. Plaintiff owns U.S. Trademark Registration No. 4800625 for CONFESSIONS OF A SHOWGIRL, which has achieved incontestable status providing "conclusive evidence" of Plaintiff's exclusive right to use the mark. 15 U.S.C. § 1115(b); Ex. 1. The second element turns on likelihood of confusion, which the Ninth Circuit evaluates under the eight-factor *Sleekcraft* test. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

### A.   Similarity of the Marks—Favors Plaintiff.

"The following axioms define and delimit the similarity analysis: (1) similarity is best evaluated by appearance, sound, and meaning; (2) marks should be considered in their entirety and as they appear in the marketplace; and (3) similarities weigh more heavily than differences." *Pom Wonderful Ltd. Liab. Co. v. Hubbard*, 775 F.3d 1118, 1127-28 (9th Cir. 2014). And where, as here, goods are closely related, a "diminished standard of similarity" applies. *Sleekcraft,* 599 F.2d at 350.

P's Mot. For Prelim. Inj.

***Sight.*** Side by side, the similarity is self-evident:

**THE LIFE OF A SHOWGIRL / CONFESSIONS OF A SHOWGIRL**

Both marks share the same syntactic structure: a narrative framing word resolving in the phrase "OF A SHOWGIRL." Both consist of standard characters and unadorned text without stylization or design elements. Ex. 1 at 2; Ex. 5 at 3. That is largely how consumers encounter them in practice: as plain text in search bars, social media feeds, and hashtags (#confessionsofashowgirl / #thelifeofashowgirl). *See, e.g.,* Ex. 18 at 2; Ex. 23 at 2; Ex. 34 at 2; Ex. 35 at 2. A consumer scanning a screen or a search result will see the same dominant phrase in the same structural arrangement. *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1151 (9th Cir. 2011) (emphasizing the importance of addressing how consumers would encounter the mark in the marketplace).

***Sound.*** Both marks resolve on the same four-syllable phrase, "of a showgirl," which carries the rhythmic and mnemonic weight of each designation. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 1060 (Fed. Cir. 1985) (weighing "similarity in cadence"). The introductory words differ, but occupy the unstressed framing position in a phrase that culminates in a shared, distinctive ending. *See Sajahtera*, 2024 U.S. Dist. LEXIS 113163, at *9-10 (comparing BEVERLY HILLS with THE BEVERLY HILLS HOTEL: "[m]inor differences—namely, Defendant's omission of 'The' and 'Hotel'— fail to negate the overall impression of similarity between the two marks"). In casual speech—the register in which consumers actually discuss entertainment—both marks naturally shorten to the same anchor (e.g., "the *Showgirl* album"). The introductory words drop away. The shared element is what stays. *See, e.g.,* Ex. 15 at 3-4.

***Meaning and Commercial Impression.*** Both marks are built on a common template: [NARRATIVE FRAME] + OF A SHOWGIRL. "Confessions of" and "The Life of" are interchangeable title constructions—framing devices of which the English language has no shortage: "memoirs of," "diary of," "adventures of." Neither framing phrase is distinctive on its own. What gives each mark its commercial identity is the

16                                          P'S MOT. FOR PRELIM. INJ.

phrase that fills the template. In both marks, that phrase is "OF A SHOWGIRL"—the same words, in the same construction, resolving on the same noun. That phrase is not a common formulation. A search of the USPTO database returns only two marks using the construction "[NOUN] OF A SHOWGIRL": Plaintiff's and Defendants'. Ex. 38 at 3. Both promise the same thing: an insider's account of a performer's experience. One frames that account as "confessions," the other as "the life," but the subject is identical. The perspective is identical. The overall commercial impression—an intimate, behind-the-curtain narrative about a showgirl—is the same. *See In re Nat'l Data Corp.*, 753 F.2d at 1060 ("ACCOUNT and EXCHANGE, while not synonyms, both have the connotation of monetary transactions, so . . . the marks carry the same overall connotation").

The confusion evidence confirms this is how consumers process the marks. In every documented instance, the pattern is consistent: consumers retain "OF A SHOWGIRL" and substitute the introductory word. They call Defendants' album "Confessions of a Showgirl." Ex. 16 at 2; Ex. 17 at 2; Ex. 19 at 2; Ex. 20 at 2; Ex. 21 at 2; Ex. 22; Ex. 31 at 2; Ex. 32 at 01:24–01:28. Consumers use Plaintiff's mark as a hashtag for Defendants' goods. Ex. 23 at 2; Ex. 25 at 2; Ex. 27 at 2; Ex. 29 at 2. In no documented instance did a consumer retain the framing word and substitute "SHOWGIRL" for another term. The shared phrase is what consumers anchor to. That is what makes it dominant. *In re Detroit Ath. Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018) (courts "give greater weight to the important or 'dominant' parts of a composite mark").

***The descriptiveness counterargument.*** Defendants may argue that "SHOWGIRL" is descriptive in the entertainment context, making the introductory words "CONFESSIONS" and "THE LIFE" the truly distinctive elements. The argument fails.

Neither mark uses "showgirl" descriptively, as neither party offers traditional showgirl services. Dkt. 1 ¶¶ 23, 33. Both uses require the imaginative leap that defines

<span style="float:right">P'S MOT. FOR PRELIM. INJ.</span>

a suggestive mark. *See Entrepreneur Media v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002). But even if the term carried some descriptive resonance, descriptive elements can still dominate consumer perception, particularly when they are the only concrete noun in marks otherwise composed of abstract framing words. *See In re Detroit Ath. Co.*, 903 F.3d at 1303; Ex. 15 at 3-4. The confusion evidence establishes that dominance empirically.

  ***The USPTO's independent analysis.*** The USPTO reached the same conclusion. The Office found the marks "similar in appearance, and similar in sound," and because "the consumer is likely to focus on the dominant noun, the term SHOWGIRL," the "resulting commercial impression" is "very similar"—concluding that "the proposed mark could be viewed as an extension of the registrant's brand." Ex. 3 at 4-5. That determination was made not in the context of this litigation but by the federal agency charged with evaluating exactly these questions, in the ordinary course of examining Defendants' application. *See UA Corp. v. United Artist Studios LLC*, 2020 WL 4369778, 2020 U.S. Dist. LEXIS 139283, at *26 (C.D. Cal. July 7, 2020) (considering USPTO's refusal to register defendant's mark on likelihood-of-confusion grounds relevant as part of *Sleekcraft* similarity analysis).

  This factor favors Plaintiff.

### B. Proximity of Goods and Services—Favors Plaintiff.

  "We examine the relatedness of the parties' goods because the more closely related the goods are, the more likely consumers will be confused by similar marks." *Entrepreneur Media*, 279 F.3d at 1147. The standard does not require identical products. "Goods and services are related when they are complementary, sold to the same class of purchasers, or similar in use and function." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1163 (9th Cir. 2021). The inquiry is whether the public would attribute the parties' respective offerings to a single source. *Sleekcraft*, 599 F.2d at 348 n.10.

P's Mot. For Prelim. Inj.

Defendants' use of THE LIFE OF A SHOWGIRL spans two commercial spheres, and both are closely related to Plaintiff's services.

***Entertainment services.*** The overlap is direct. Plaintiff's registration covers entertainment in the nature of live stage performances in the fields of music, singing and dancing, as well as entertainment media production. Ex. 1 at 2. Defendants' trademark application seeks registration in the same class and encompasses every category Plaintiff's registration covers. Ex. 5 at 3. The USPTO confirmed this overlap, finding that "both marks are used in connection with general entertainment services that involve musical and/or theater performances" and that "[n]either the registration nor the application contain any limitations on these entertainment services." Ex. 3 at 7. This is not a close question.

***Consumer goods.*** Trademark rights are not confined to identical goods. They "extend to any goods related in the minds of consumers." *Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) (citation omitted); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1213 (9th Cir. 2012) (adopting a "rather flexible approach to the whole notion of competition"). In the entertainment industry, audiences expect performers to sell branded merchandise in connection with their live shows. It is, as Bravado's president has described, "the No. 2 source of revenue . . . after ticket sales." Ex. 13 at 4. Indeed, Defendants have built their commercial model on that expectation and have said so under oath. In a prior verified complaint, TAS represented to a federal court that branded merchandise is sold "in direct affiliation with Ms. Swift's name and image, at concert venues in conjunction with Ms. Swift's live performances[.]" Ex. 37 at 6 (¶ 18).

Given these ingrained expectations and the marks' similarity, consumers who encounter a tumbler bearing THE LIFE OF A SHOWGIRL and who are separately familiar with CONFESSIONS OF A SHOWGIRL live performances will naturally associate the two—either that Plaintiff is affiliated with the merchandise, or, in the reverse confusion scenario here, that Plaintiff's brand is derived from the one on the

tumbler. That is the injury trademark law exists to prevent. *See Ironhawk*, 2 F.4th at 1160.

The USPTO's analysis, while addressed to a narrower question, points the same direction. The Office found an "inherent connection" between Plaintiff's entertainment services and Defendants' musical recordings, concluding that consumers familiar with Plaintiff's mark would be "likely to believe that registrant is authorizing applicant's use of the mark." Ex. 3 at 7-8. If that inference holds for recordings, it holds at least as well for consumer goods sold under the same designation. In the entertainment industry, merchandise and performances are not separate markets. Ex. 13 at 2. They are two sides of the same commercial relationship, and consumers recognize them as such. *Id*. at 4 (Bravado's president: "On tour, there's usually a truck following the band with inventory . . . It's not unusual for a major tour to transact hundreds of thousands of dollars in merch in a single night.").

This factor favors Plaintiff.

### C.    Strength of the Marks—Favors Plaintiff.

In a reverse confusion case, the strength-of-the-marks analysis takes a different form. "[W]e evaluate the conceptual strength of [the senior user's] mark and compare it to the commercial strength of [the junior user's] mark." *Ironhawk*, 2 F.4th at 1162; *Iyo, Inc. v. Io Prods., Inc.*, 2025 WL 3471705, 2025 U.S. App. LEXIS 31443, at *4-5 (9th Cir. Dec. 3, 2025). In the reverse confusion scenario, it is the junior user's commercial dominance that generates the likelihood of confusion. *JL Bev. Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1109 (9th Cir. 2016) (citation omitted). The stronger the junior user's marketplace presence, the more likely consumers are to assume the senior user's brand is affiliated with or derived from the junior user. *Id*.

On conceptual strength, CONFESSIONS OF A SHOWGIRL is suggestive. As discussed above, "OF A SHOWGIRL" is not used descriptively in either mark. Both employ the term evocatively, requiring the imaginative leap that defines a suggestive mark. *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1070 (E.D. Cal.

20                    P'S MOT. FOR PRELIM. INJ.

2009). Plaintiff's federal registration independently evidences its distinctiveness. *See Ironhawk*, 2 F.4th at 1162 ("federal registration provides *prima facie* evidence that the [senior user's] mark is inherently distinctive (*i.e.*, at least suggestive)"). And "the incontestable status of [Plaintiff's] mark serves as conclusive proof that the mark has secondary meaning." *Entrepreneur Media*, 279 F.3d at 1142 n.3.

On commercial strength of the junior user, the disparity is overwhelming and, in a reverse confusion case, that is precisely the point. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000); *see also Ironhawk*, 2 F.4th at 1163. THE LIFE OF A SHOWGIRL is backed by a dedicated management company (TAS), Ex. 10 at 2-8, a major-label distributor (UMG), Ex. 12 at 2, a global merchandising operation generating over $900 million in annual revenue (Bravado), Ex. 13 at 3, and national brand collaborations reaching millions of consumers, Dkt. 1 ¶ 47. *See also* Ex. 11 at 2; Ex. 37 at 6-7 (¶ 19). In *Iyo*, the Ninth Circuit found this factor satisfied where the junior user's mark was "commercially strong, as evidenced by the extensive coverage of [its] launch in national media outlets." 2025 U.S. App. LEXIS 31443, at *4-5. Defendants' commercial strength is of a categorically different magnitude.

This factor favors Plaintiff.

**D.     Evidence of Actual Confusion—Favors Plaintiff.**

At the preliminary injunction stage, "this factor is generally not of significant relevance given the difficulty in proving actual confusion at this point in litigation." *Sajahtera*, 2024 U.S. Dist. LEXIS 113163, at *15; *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*, 758 F.3d 1069, 1072-73 (9th Cir. 2014) (actual confusion is "of diminished importance" at the preliminary injunction stage). Despite these diminished expectations, and before any opportunity for discovery or a consumer survey, Plaintiff has evidence of confusion arising from the brief period of concurrent use.

The most probative instance is direct. For instance, a viewer of a YouTube video discussing the dispute between the parties, who described having attended Plaintiff's

P'S MOT. FOR PRELIM. INJ.

CONFESSIONS OF A SHOWGIRL production, stated publicly: "I personally was confused by Taylor Swift's album title." Ex. 33 at 3. That is a consumer in the relevant market—someone who knew Plaintiff's brand from firsthand experience—who encountered Defendants' designation and was confused by the two. *Id*.

Additional evidence documents the marks' functional interchangeability in the manner that reverse confusion predicts. Consumers on TikTok and Instagram have used Plaintiff's mark as a hashtag when discussing Defendants' products. Ex. 23 at 2; Ex. 25 at 2; Ex. 27 at 2; Ex. 29 at 2. Those consumers are not simply misremembering an album title. They are associating Plaintiff's mark with Defendants' goods, treating it as an identifier for Defendants. The Lanham Act protects against uses "likely to cause . . . mistake," or confusion "as to the affiliation, connection, or association" between parties, not merely confusion at the point of purchase. 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). When a consumer uses Plaintiff's mark to tag Defendants' product, the marks have failed to perform their source-distinguishing function regardless of whether that consumer could, if prompted, identify the correct title. In a reverse confusion case, that is precisely the injury: the senior user's mark is absorbed into the junior user's commercial identity until consumers assume the original belongs to the newcomer. *Ironhawk*, 2 F.4th at 1160. Every instance in which a consumer uses Plaintiff's mark to identify Defendants' product advances that erosion.

The confusion evidence is corroborated by Plaintiff's displacement in the digital channels through which she reaches her audience. When a consumer enters Plaintiff's exact registered mark into Google, eight of ten autocomplete suggestions direct the consumer toward Defendants. Ex. 34 at 2. On YouTube, nine consecutive results for Defendants appear before a single result for Plaintiff. Ex. 36 at 2-4. Plaintiff does not contend that algorithmic behavior is itself confusion. But autocomplete predictions are not random—they reflect the actual aggregate search behavior of millions of consumers. *See* Karapapa & Borghi, *Search Engine Liability for Autocomplete Suggestions*, 23 Int. J.L. & Info. Tech. 261, 265 (2015) ("If Google autocomplete

P'S MOT. FOR PRELIM. INJ.

suggests a certain search term . . . people are more likely to search it; the more people search a certain term, the more likely Google autocomplete is to suggest it."). This displacement is the mechanism through which reverse confusion operates: Defendants' overwhelming commercial presence is progressively overwriting Plaintiff's mark in the digital infrastructure consumers use to discover her. *Rearden*, 683 F.3d at 1214 (non-consumer confusion is relevant where it "could create an inference that consumers are likely to be confused" or "could influence consumers"); *Iyo*, 2025 U.S. App. LEXIS 31443, at *5 (non-consumer confusion "can serve as a 'proxy' for consumer confusion").

This factor favors Plaintiff.

**E.     Marketing Channels Used—Favors Plaintiff.**

Marketing channels converge when "the general class of . . . purchasers exposed to the products overlap." *Sleekcraft*, 599 F.2d at 353; *see also Pom Wonderful*, 775 F.3d at 1130-31. Both parties offer entertainment to the same consumers—audiences for live performances, music, and entertainment content. Both distribute through the same digital platforms, including television, YouTube, and social media, and both perform in overlapping entertainment markets across the United States. Plaintiff Decl. ¶¶ 2-4; Ex. 37 at 34-35; Ex. 36 at 2-6; *see also* Ex. 3 at 7.

This factor favors Plaintiff.

**F.     Degree of Consumer Care—Favors Plaintiff.**

This factor considers "the sophistication of the customers," including whether a "reasonably prudent consumer would take the time to distinguish between the two product lines." *Ironhawk*, 2 F.4th at 1167 (internal quotation marks omitted). Purchasers of inexpensive goods "are likely to exercise less care, thus making confusion more likely." *Brookfield*, 174 F.3d at 1060.

Consumers encounter both marks most frequently through free online content (e.g., YouTube, social media) where the degree of care is at its lowest. A consumer scrolling through search results or a social media feed is making split-second

P'S MOT. FOR PRELIM. INJ.

judgments based on general impressions, not pausing to investigate provenance. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) ("Navigating amongst web sites involves practically no effort whatsoever, and arguments that Web users exercise a great deal of care before clicking on hyperlinks are unconvincing."). It is in precisely this environment that the documented confusion has occurred. *See, e.g.,* Ex. 18 at 2; Ex. 23 at 2; Ex. 34 at 2; Ex. 35 at 2.

Confusion is equally likely at the retail level. The parties' consumer goods—T-shirts, candles, barrettes, books—are inexpensive items that invite impulse buying, not careful deliberation. *See Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1214 (C.D. Cal. 1998).

This factor favors Plaintiff.

**G.     Defendants' Intent—Favors Plaintiff.**

Intent is established if "the defendant knew of the mark, should have known of the mark, . . . failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017). The record leaves no room for doubt.

Defendants are charged with constructive notice of Plaintiff's mark, which has been on the Principal Register since 2015. 15 U.S.C. § 1072; Ex. 1 at 2. Their own clearance infrastructure makes actual knowledge a near certainty. TAS manages more than 170 active or pending registrations on behalf of Swift. Ex. 10 at 2-8. Trademark clearance is foundational to an operation of this scale. 1A Gilson on Trademarks § 3.02. Defendants either found Plaintiff's mark and proceeded regardless, or failed to conduct the search that basic practice demanded. Either way, the risk of confusion was culpably disregarded. *JL Beverage*, 828 F.3d at 1111 (intent factor favors "plaintiff 'where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark.'" (citation omitted)).

Any remaining ambiguity was eliminated on November 5, 2025, when the USPTO refused registration of THE LIFE OF A SHOWGIRL based on a likelihood of

P'S MOT. FOR PRELIM. INJ.

confusion with Plaintiff's mark, identifying her registration by name and number. Ex. 3 at 3. Defendants' response was not to reconsider. They did not file a response arguing the marks were distinguishable—the ordinary course for an applicant who believes the refusal is wrong. Instead, they requested suspension, effectively parking the application while continuing to sell goods under the refused designation. Ex. 4 at 2-3; Ex. 6 at 2-6; *see Concord Music Grp., Inc. v. Stax. Pty Ltd.*, 2023 WL 2977495, 2023 U.S. Dist. LEXIS 68730, at *13 (C.D. Cal. Apr. 6, 2023) (intent established where "Defendants continued to use [their mark], disregarding the USPTO's refusal to register [it] to Defendants due to the likelihood of confusion").

This factor strongly favors Plaintiff.

## H. The Likelihood of Expansion—Favors Plaintiff.

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (citation omitted). "When goods are closely related, any expansion is likely to result in direct competition." *Id.*; *see also Brookfield*, 174 F.3d at 1060 (this factor "is relatively unimportant where two companies already compete").

The parties already operate in overlapping markets, as the proximity analysis demonstrates. But even setting that overlap aside, this factor independently weighs in Plaintiff's favor because both parties continue to expand under their respective designations.

Defendants have already extended THE LIFE OF A SHOWGIRL well beyond a musical release into consumer goods and commercial collaborations with national brands. Ex. 6 at 2-6; Dkt. 1 ¶ 47. Their trademark application makes the intended scope explicit: registration across more than a dozen classes, covering goods ranging from ponchos and disposable napkins to Christmas tree skirts and aprons, in addition to musical recordings and live entertainment. Ex. 5 at 2-3. This is not a designation tethered to an album. It is a commercial brand designed to reach every corner of a

P'S MOT. FOR PRELIM. INJ.

consumer's life. Defendants have not yet toured in support of this release, Ex. 14 at 2, but when they do, the designation will enter the live entertainment market—the very market in which Plaintiff has performed CONFESSIONS OF A SHOWGIRL for over a decade.

On Plaintiff's side, the trajectory of the CONFESSIONS OF A SHOWGIRL brand has been one of steady, organic expansion, from a column to a live show, book, podcast, and video content. Plaintiff Decl. ¶¶ 4, 6; Dkt. 1 ¶¶ 34-38. Defendants' trademark application now claims rights in every one of those categories and dozens more, ensuring that wherever Plaintiff expands her brand, Defendants' confusingly similar designation will already occupy the field. Ex. 5 at 2-3.

This factor favors Plaintiff.

Even if this Court were to find that Plaintiff has raised only serious questions going to the merits rather than a full likelihood of success, relief would still be warranted. Under the Ninth Circuit's sliding-scale approach, a preliminary injunction may issue where serious questions are combined with a balance of hardships that tips sharply towards the plaintiff. *Alliance for the Wild Rockies*, 632 F.3d at 1135. Here, Plaintiff is a solo performer whose sole trademark is being subsumed by a global commercial enterprise. The balance of hardships could not tip more sharply.

## III. PLAINTIFF IS LIKELY TO SUFFER IRREPARABLE HARM

In 2020, Congress restored the presumption of irreparable harm to the Lanham Act, providing that a plaintiff seeking a preliminary injunction in a trademark case is "entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits[.]" 15 U.S.C. § 1116(a); Trademark Modernization Act of 2020, Pub. L. No. 116-260, § 226, 134 Stat. 1182, 2208 (2020); *see also InSinKerator*, 163 F.4th at 622. That presumption "places the ultimate burden of production on the question of irreparable harm onto the alleged infringer." *Vital Pharms. v. PHD Mktg.*, 2021 WL 6881866, 2021 U.S. Dist. LEXIS 254038, at *13 (C.D. Cal. Mar. 12, 2021) (citation omitted). Defendants may overcome the

P'S MOT. FOR PRELIM. INJ.

presumption by demonstrating, for example, that Plaintiff delayed in seeking relief, that her injuries are purely pecuniary, or that Defendants have ceased the infringing activities. *Concord Music Grp.*, 2023 U.S. Dist. LEXIS 68730, at \*14. None of those circumstances obtains here.

***No delay.*** Upon learning of Defendants' adoption of the designation in August 2025, Plaintiff consulted with counsel. Plaintiff Decl. ¶ 7. During this period, Plaintiff continued to perform and create content under her brand while monitoring Defendants' use of the designation. *Id*. Rather than rushing to litigation, Plaintiff permitted the USPTO examination process to run its course. When the USPTO refused Defendants' application on November 5, 2025, and then suspended it at Defendants' request in March 2026, it became clear that Defendants had no intention of conforming their conduct to the Office's determination. Ex. 3 at 3; Ex. 4 at 2-3; Ex. 5 at 2, 4; Ex. 6 at 2-6. Plaintiff retained litigation counsel, filed suit on March 30, 2026, Dkt. 1, and now moves for preliminary relief. Plaintiff Decl. ¶ 9. That timeline—monitoring an active administrative proceeding, affording Defendants a window to cure, and filing when they expanded instead—reflects diligence, not delay.

***Not purely pecuniary.*** Plaintiff's central injury is not lost revenue. It is the progressive erosion of her mark's source-identifying function. In a reverse confusion case, the harm is not that Plaintiff loses customers to Defendants; it is that Plaintiff loses the meaning of her mark entirely. *Ironhawk*, 2 F.4th at 1160. No retrospective damages award can restore a mark's source-identifying capacity once consumers have come to associate it with someone else. That risk is acute here, where Plaintiff—a solo performer with a single trademark, Ex. 1 at 2—faces a junior user backed by a dedicated brand management company overseeing more than 170 registrations, Ex. 10 at 2-8, a major-label distributor, Ex. 12 at 2, and a global merchandising operation, Ex. 13 at 3. The goodwill Plaintiff has built over twelve years of continuous use cannot be recaptured through damages once it has been dissipated. *Regents of Univ. of Cal. v. Am. Broad. Cos*., 747 F.2d 511, 520 (9th Cir. 1984) (dissipation of "community

P's Mot. For Prelim. Inj.

goodwill and support garnered over the years" constitutes irreparable harm); Ex. 33 at 3. And no damages award can recalibrate a search algorithm or undo the associations consumers form as a result. *See Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) ("Evidence of loss of control over business reputation . . . can constitute irreparable harm." (cleaned up)); Ex. 34 at 2; Ex. 35 at 2; Ex. 36 at 2-4.

***Not ceased.*** Defendants' use of THE LIFE OF A SHOWGIRL as a trademark is ongoing. As of the filing of this motion, Defendants continue to operate a dedicated retail storefront under the designation and to sell goods bearing it. Ex. 6 at 2-6. The commercial program is expanding, not contracting.

The presumption of irreparable harm is unrebutted.

## IV.    THE BALANCE OF EQUITIES FAVORS PLAINTIFF

The balance of equities requires the Court to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Here, both the harm to Plaintiff and the burden on Defendants weigh decisively in Plaintiff's favor.

### A.    The Harm to Plaintiff Absent Relief Is Existential.

CONFESSIONS OF A SHOWGIRL is not one mark among many for Plaintiff. It is the only one she has. Ex. 1 at 2. She has built her professional identity under it for more than a decade, and she has no portfolio of alternative brands, no corporate backing, and no global marketing operation to compete for consumer attention. Plaintiff Decl. ¶ 5. Defendants have all of these. *See, e.g.,* Ex. 10 at 2-8; Ex. 13 at 3. That asymmetry is directly relevant to the equities, and it tips in Plaintiff's favor. *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 726 (9th Cir. 1985).

If Defendants' use continues unchecked, the harm is not merely economic—it is the progressive erasure of Plaintiff's ability to be recognized as the source of her own brand. *Ironhawk*, 2 F.4th at 1160. That harm deepens with each day the commercial program continues and becomes increasingly harder to reverse. *See Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1198 (C.D. Cal. 2013)

(balance tipped sharply toward senior user where withholding an injunction threatened to "destroy [senior user's] business, which it has built over a decade").

### B.    The Burden on Defendants Is Self-Inflicted and Manageable.

Plaintiff does not minimize the practical implications of the requested relief. Defendants have built a commercial program around THE LIFE OF A SHOWGIRL, and an injunction would require them to modify it. But the burden must be assessed in context.

*First*, it is a burden of Defendants' own making. Defendants' clearance infrastructure—the same operation that manages more than 170 trademark registrations, Ex. 10 at 2-8—would have identified Plaintiff's mark before the designation was adopted. The USPTO confirmed the conflict when it refused Defendants' application on November 5, 2025, identifying Plaintiff's registration by name and number. Ex. 3 at 3. Defendants expanded the program anyway. Ex. 6 at 2-6; Ex. 9 at 2-3. Every dollar spent after the refusal was spent with knowledge that the designation was confusingly similar to a mark belonging to someone else. Courts routinely discount self-inflicted harm in this analysis. *Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities" (citation omitted)); *see also* 4 McCarthy on Trademarks and Unfair Competition § 30:51 (5th ed.) ("the injury a defendant might suffer if preliminarily enjoined may be discounted by the fact that the defendant brought that injury upon itself").

*Second*, the injunction is scoped to what Defendants themselves have claimed as trademark use. It reaches goods and services within the classes identified in Defendants' own trademark application. Ex. 2 at 2-5; Ex. 5 at 2. It does not affect any of Defendants' other trademarks or products. Ex. 10 at 2-8. The goods that do bear the designation need not be destroyed or recalled; they need only be removed from active sale pending resolution. *See Sajahtera*, 2024 U.S. Dist. LEXIS 113163, at *23 (finding the balance of equities favored the plaintiff because "a preliminary injunction would

P'S MOT. FOR PRELIM. INJ.

not foreclose Defendant from selling [non-infringing] merchandise").

*Finally*, the timing favors early relief. Defendants have not yet toured in support of this release. Ex. 14 at 2. No dates have been announced. No tickets have been sold. No reliance interests in live entertainment—Plaintiff's core market—have attached. If the Court acts now, it can prevent the designation from entering that market. If the Court waits, Defendants will expand further, consumer associations will deepen, and the equities will shift.

### C.    Bond.

Pursuant to Federal Rule of Civil Procedure 65(c), the Court should set a bond commensurate with the circumstances of this case. Plaintiff is a solo performer who has brought this action to protect the single trademark under which she has built her career. Plaintiff Decl. ¶¶ 3-6. A bond set at a level that would effectively foreclose preliminary relief would deny Plaintiff access to the very remedy trademark law provides. *See* 15 U.S.C. § 1116(a); *see also Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (court has "discretion as to the amount of security required, *if any*" (emphasis in original, citation omitted)). The injunction requires Defendants only to cease using a designation the USPTO has found confusingly similar to Plaintiff's registered mark. The risk of a wrongful injunction is low, the burden of compliance is manageable within Defendants' existing operations, and Plaintiff's ability to vindicate her rights should not turn on her ability to post a bond calibrated to the scale of Defendants' enterprise. Plaintiff respectfully requests that the Court exercise its discretion to set a bond reflecting these circumstances. *See Sajahtera*, 2024 U.S. Dist. LEXIS 113163, at *25.

### V.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

"[T]he public interest in not being deceived or confused about . . . source or identity . . . favors granting injunctive relief." *El Pollo Loco, Inc. v. MIK Food Inc.*, 2021 WL 6104875, 2021 U.S. Dist. LEXIS 219176, at *5 (C.D. Cal. Nov. 1, 2021); *Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 715 (9th Cir.

P'S MOT. FOR PRELIM. INJ.

2005) ("Trademarks protect the public from confusion"). The public is being confused now. The USPTO reached the same conclusion when it refused Defendants' application on likelihood-of-confusion grounds. Ex. 3 at 3. Numerous instances of consumer confusion have been documented. Consumers are referring to Defendants' album by Plaintiff's mark, using Plaintiff's mark as a hashtag for Defendants' products, and encountering search results that treat the two designations as interchangeable.[5] Every day that Defendants continue to use a confusingly similar designation on goods sold to the public extends the confusion further.

Enjoining infringing conduct "promote[s] the public interest in protecting trademarks generally[.]" *Brookfield*, 174 F.3d at 1066. That interest does not diminish because the senior user is small and the junior user is large—indeed, "the doctrine of reverse confusion is designed to prevent the calamitous situation where a larger, more powerful company usurps the business identity of a smaller senior user." *Ironhawk*, 2 F.4th at 1160 (cleaned up). A preliminary injunction should issue.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction enjoining Defendants from using THE LIFE OF A SHOWGIRL as a trademark or source-identifying designation in connection with any goods or services within the classes identified in Defendants' U.S. Trademark Application Serial No. 99331566, including but not limited to merchandise, consumer goods, and entertainment services, pending final resolution of this matter.

DATED: April 7, 2026                    Respectfully submitted,

                                        */s/ Jaymie Parkkinen*
                                        Jaymie Parkkinen

                                        *Counsel for Plaintiff*

---

[5] Ex. 16 at 2; Ex. 17 at 2; Ex. 19 at 2; Ex. 20 at 2; Ex. 21 at 2; Ex. 22; Ex. 23 at 2; Ex. 25 at 2; Ex. 27 at 2; Ex. 29 at 2; Ex. 31 at 2; Ex. 32 at 01:24–01:28; Ex. 34 at 2; Ex. 35 at 2; Ex. 36 at 2-4.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing memorandum of points and authorities is 23 pages, in compliance with the 25-page limit set forth in Section VII(D) of this Court's Standing Order.

DATED: April 7, 2026

_/s/ Jaymie Parkkinen_
Jaymie Parkkinen

_Counsel for Plaintiff_