JAYMIE PARKKINEN (S.B. #318394)
808 Wilshire Blvd., Suite 200-255
Santa Monica, California 90401
Telephone:  (323) 919-3590
Email:       jp@prkknn.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAREN FLAGG, an individual,<br><br>              Plaintiff,<br>       v.<br><br>TAYLOR SWIFT, an individual; TAS RIGHTS MANAGEMENT, LLC, a Tennessee limited liability company; UMG RECORDINGS, INC., a Delaware corporation; BRAVADO INTERNATIONAL GROUP MERCHANDISING SERVICES INC., a California corporation; and DOES 1-25,<br><br>              Defendants. | Case No. 2:26-cv-3354-SRM-BFM<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1.  **TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)**<br><br>2.  **FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION (15 U.S.C. § 1125)**<br><br>3.  **CALIFORNIA UNFAIR COMPETITION (CAL. BUS. & PROF. CODE §§ 17200 *et seq.*)**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Maren Flagg alleges as follows based on personal knowledge as to her own conduct and on information and belief as to all other matters:

### INTRODUCTION

1.     In 2014, in the pages of *Las Vegas Weekly*, a working performer began writing candidly about her life inside the entertainment industry. Maren Flagg, professionally known as Maren Wade ("Plaintiff"), called it CONFESSIONS OF A SHOWGIRL. The name stuck.

2.     What began as a weekly column became a live show. The live show became a touring performance. Over the course of a decade, CONFESSIONS OF A SHOWGIRL grew into an entertainment brand spanning performances, writing, a book, a podcast, and video content—built by one person, city by city and show by show.

3.     Plaintiff has performed CONFESSIONS OF A SHOWGIRL across the United States at established venues including New York City's Laurie Beechman Theatre and Myron's at The Smith Center in Las Vegas. She has appeared on television under that name, earned national press coverage, and continues to extend the brand into new media.

4.     In 2015, the United States Patent and Trademark Office ("USPTO") registered CONFESSIONS OF A SHOWGIRL for entertainment services. After years of continuous use, the mark became incontestable under 15 U.S.C. § 1065—a statutory recognition of the goodwill Plaintiff earned through sustained personal effort.

5.     For more than a decade, CONFESSIONS OF A SHOWGIRL identified a single source: Plaintiff.

6.     Then in 2025, Defendant Taylor Swift ("Swift") launched a brand of her own: THE LIFE OF A SHOWGIRL. Swift personally selected the name, approved it, promoted it, and shares in the revenue it generates. Around it, her affiliated entities built a coordinated commercial program: TAS Rights Management, LLC ("TAS") owns and licenses the mark; UMG Recordings, Inc. ("UMG") distributes the

FIRST AMENDED COMPLAINT

recordings and related goods; and Bravado International Group Merchandising Services Inc. ("Bravado") designs, manufactures, and sells the branded merchandise.[1]

7. Within weeks, THE LIFE OF A SHOWGIRL was affixed to consumer goods, stamped onto labels, tags, and packaging, and deployed as a source identifier across retail channels, aimed at the same audience Plaintiff had spent years cultivating.

8. The similarity between CONFESSIONS OF A SHOWGIRL and THE LIFE OF A SHOWGIRL is immediate. The marks share the same grammatical structure and resolve on the same dominant phrase, OF A SHOWGIRL. Both convey the same commercial impression: an inside, behind-the-scenes account of a showgirl's life. And both reach the same consumers on overlapping goods and services through the same channels. So alike are the marks that consumers have already begun to conflate them, using Plaintiff's mark to refer to Defendants' goods.

9. That similarity would not have escaped Defendants' notice. On Swift's behalf alone, TAS holds one of the largest trademark portfolios in entertainment— more than 175 registrations and applications, and growing. For Defendants' legal and brand management teams, trademark clearance is routine. A standard search would have revealed Plaintiff's federally registered, incontestable mark and her years of prior use. Indeed, Defendants are not merely familiar with trademark law—they are among its most vigorous enforcers, having filed multiple federal actions to seize goods from vendors selling trademarked merchandise near concert venues. They know firsthand the harm that infringement inflicts on a brand, having leveraged that very harm in federal court when it served their interests to do so.

10. If Defendants missed Plaintiff's mark, the USPTO did not. It refused to register THE LIFE OF A SHOWGIRL, citing Plaintiff's CONFESSIONS OF A SHOWGIRL registration by name and number and finding the two marks confusingly

---

[1] Swift, TAS, UMG, and Bravado are referred to collectively as "Defendants" where they jointly engaged in the conduct attributed to them; allegations directed at a specific Defendant identify that Defendant.

FIRST AMENDED COMPLAINT

similar. Defendants were thus on actual notice that their designation was likely to be confused with a mark that already belonged to someone else. They expanded their use anyway. Plaintiff was never contacted.

11.    The result is textbook reverse confusion: a junior user's overwhelming commercial presence drowns out the senior user's mark, until consumers begin to assume that the original is the imitation. What Plaintiff had built over twelve years, Defendants threatened to erase in weeks.

12.    Defendants may contend that THE LIFE OF A SHOWGIRL, as the title of a musical work, lies beyond the reach of trademark law. It does not. Whatever protection might attach to expression, it does not immunize Defendants' separate decision to adopt a confusingly similar name as a trademark. The only question, then, is whether Defendants used THE LIFE OF A SHOWGIRL as a source identifier. They did, and their own filings prove it: TAS applied to register the name as a trademark across fourteen classes of goods—musical recordings, CDs, and records among them, but also candles, shoe laces, disposable napkins, and other ordinary consumer goods that bear no expressive content at all. One does not register expression. One registers a trademark.

13.    Plaintiff, as a performer herself, respects Swift's right to creative expression, and nothing in this action challenges it. But what Defendants did here is not expression. It is infringing trademark use. The USPTO told Defendants as much when it refused their application. They proceeded anyway, at a scale that threatens to erase Plaintiff from her own brand.

14.    Those are not artistic choices but commercial ones, and they have consequences. Plaintiff brings this action to protect the goodwill she has built, to halt further confusion in the marketplace, and to ensure that the identity of her brand remains hers.

**JURISDICTION AND VENUE**

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331

FIRST AMENDED COMPLAINT

and 1338(a) because Plaintiff asserts claims arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq*. (the "Lanham Act"). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts.

16.     This Court has personal jurisdiction over each Defendant. THE LIFE OF A SHOWGIRL is Swift's project, built on intellectual property that Swift and TAS own, control, and license, and brought to market through a commercial program that Swift and TAS directed and executed in substantial part through their California-based affiliates, UMG and Bravado. Defendants each purposefully directed their infringing conduct at California and at California consumers, and Plaintiff's claims arise out of and relate to that California-directed conduct.

17.     Swift selected and adopted the designation and, over more than a year, drove its commercialization, investing her own time, effort, and resources to bring it to market. She built the commercial program around it, authorized and licensed its exploitation to her California-based affiliates who carry it out from this State, and shares in the revenue it produces. She aimed its promotion squarely at California: she personally wrote and directed the music video for the lead single from THE LIFE OF A SHOWGIRL, filmed it at the Los Angeles Theatre in downtown Los Angeles, and shot photography for her merchandise at that same venue; she publicly invited consumers to attend the California theatrical exhibition of her release-party film, shown in cinemas in this District; the promotion she funded and drove targeted the California market, including through fan activations and physical billboards across Los Angeles County; and she appeared in person in Los Angeles at the 2026 iHeartRadio Music Awards to promote THE LIFE OF A SHOWGIRL. These were Swift's own deliberate choices to reach California and California consumers, not random or fortuitous consequences of a release distributed everywhere. The designation Swift promoted in California is the designation deployed as a trademark on the goods at issue, and Plaintiff's claims arise out of or relate to that conduct.

FIRST AMENDED COMPLAINT

18. TAS owns, administers, and enforces trademark and other intellectual property rights behind THE LIFE OF A SHOWGIRL, and its role is one of active control, not passive ownership. TAS actively manages Swift's commercial affairs, including by commissioning photography and controlling coverage of her California appearances. It polices that intellectual property, pursuing infringing uses and challenging conflicting trademark applications, and it exercised that control over the designation at issue. TAS authorized and licensed the designation, together with the associated material and rights, to UMG and Bravado—both California entities—under the contractual arrangements those entities require in order to manufacture, distribute, and sell the goods bearing it. UMG and Bravado make and sell those goods from their California operations. The goods are sold through an online store operated by or on behalf of Defendants, which identifies TAS as an owner of Swift's trademarks and associated material and displays that material as used by permission of TAS. TAS thus authorized, licensed, and controlled the use of the designation as a trademark on goods made and sold in California, and Plaintiff's claims arise out of and relate to that conduct. In the alternative, because TAS directed and controlled UMG's and Bravado's use of the designation as a trademark on goods in and from California, that use is attributable to TAS for purposes of personal jurisdiction.

19. UMG maintains its principal place of business in Santa Monica, California, and, through its Republic Records division, serves as Swift's record label. Acting for Swift and under licenses from her and TAS, UMG released and distributed the recordings bearing THE LIFE OF A SHOWGIRL from its California operations, placing them into California through digital platforms and through physical retailers in this District, where they are advertised and sold under the infringing designation. The decisions to release, distribute, and commercially exploit those goods were made and carried out in substantial part in California, and Swift shares in the revenue. Plaintiff's claims arise directly from that distribution and sale.

20. Bravado is a California corporation with its principal place of business in

6                                          FIRST AMENDED COMPLAINT

Santa Monica, California, and operates alongside UMG within the Universal Music Group. Working with Swift and under licenses from her and TAS, Bravado designed, manufactured, marketed, and sold the consumer merchandise bearing THE LIFE OF A SHOWGIRL from its California operations, as part of a comprehensive branding campaign for the designation. The design, branding, manufacture, and sale of those goods were conceived and carried out in substantial part in California, and Swift shares in the revenue. Plaintiff's claims arise directly from that conduct.

21.    Each Defendant thus purposefully directed at California the very conduct from which Plaintiff's claims arise. The program was Swift's, built on intellectual property she and TAS own and license and executed through UMG and Bravado from their California headquarters; the resulting goods were promoted in California, offered for sale to consumers Defendants knew were located here, and sold in physical retail stores in this District. The designation Defendants selected, licensed, promoted, and sold in California is the designation that infringes Plaintiff's mark, and each Defendant shares in the revenue that conduct generates. UMG and Bravado are also independently subject to general jurisdiction: Bravado is incorporated in California, and both maintain their principal places of business in this State.

22.    These Defendants are no strangers to California. Swift maintains at least one residence in this District and contracts with California entities to record, distribute, and merchandise her work—most recently her June 2026 *Toy Story 5* song, released through California-based Disney entities and performed at the film's Los Angeles premiere. UMG and Bravado operate from Santa Monica, and TAS administers the California relationships through which Swift's work and merchandise are produced, distributed, and sold. Defendants' California contacts are substantial and ongoing. Requiring Defendants to answer here is reasonable.

23.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). UMG and Bravado maintain their principal places of business here, and Swift maintains a residence here. A substantial part of the events giving rise to Plaintiff's

7                    FIRST AMENDED COMPLAINT

claims occurred here as well: the use of THE LIFE OF A SHOWGIRL was authorized, directed, and carried out in this District; the goods bearing it were sold and distributed to consumers here; and a substantial part of the harm to Plaintiff occurred here.

## PARTIES

24.    Plaintiff Maren Flagg, professionally known as Maren Wade, is an individual and a resident of Nevada. She is a singer, songwriter, comedian, and author who has developed and performed under the CONFESSIONS OF A SHOWGIRL mark since at least 2014.

25.    Defendant Swift is an individual. She is a singer, songwriter, and author who releases music and related goods and services under her name and associated designations, and who maintains a residence in this District. Swift personally selected, approved, and promoted THE LIFE OF A SHOWGIRL.

26.    Defendant TAS is a limited liability company organized under the laws of Tennessee. TAS owns, manages, and licenses intellectual property associated with Swift's projects, including THE LIFE OF A SHOWGIRL, and filed the federal application to register that designation.

27.    Defendant UMG is a corporation organized under the laws of Delaware with its principal place of business in Santa Monica, California. UMG distributes and commercially exploits Swift's music releases and related goods, including those bearing THE LIFE OF A SHOWGIRL.

28.    Defendant Bravado is a corporation organized under the laws of California with its principal place of business in Santa Monica, California. Bravado designs, manufactures, distributes, and sells the consumer goods bearing THE LIFE OF A SHOWGIRL.

29.    Plaintiff is informed and believes, and on that basis alleges, that Defendants sued herein as Does 1 through 25 are responsible in some manner for the acts alleged herein and that Plaintiff's injuries were proximately caused by their conduct. The true names and capacities of these defendants are presently unknown to

FIRST AMENDED COMPLAINT

Plaintiff. Plaintiff will amend this First Amended Complaint to allege their true names and capacities when ascertained.

30.    Defendants did not act at random or independently. They operated as a coordinated commercial enterprise, pursuant to contractual and licensing relationships among them, to bring THE LIFE OF A SHOWGIRL to market as a branded line of goods. Swift personally owns rights in the musical work underlying the designation. TAS, as owner of the trademark and associated rights, licensed them to UMG and Bravado—authorization those entities require in order to manufacture, distribute, and sell the goods bearing the designation—and Swift authorized and directed that exploitation, including through agreements with UMG and Bravado governing the release, distribution, and merchandising of the material she created. As the creative and commercial principal who selected, approved, and promoted the designation and directed its exploitation, Swift is personally liable for the infringing conduct she directed and controlled.

31.    At all relevant times, Defendants' acts alleged herein occurred in interstate commerce within the meaning of the Lanham Act.

## FACTUAL ALLEGATIONS

### Plaintiff's Development of the CONFESSIONS OF A SHOWGIRL Brand

32.    Plaintiff is a singer, songwriter, comedian, and author who has developed and operated the CONFESSIONS OF A SHOWGIRL brand for more than a decade.

33.    Plaintiff began using the CONFESSIONS OF A SHOWGIRL mark in commerce in or about 2014 in connection with writing and entertainment content, beginning with a column in *Las Vegas Weekly* about her experiences as a working performer.

34.    The column evolved into a live cabaret show presented under the CONFESSIONS OF A SHOWGIRL name. That show combines music, singing, and comedy drawn from Plaintiff's life as a working performer, including candid, humorous accounts of the gap between the glamorized perception and the reality of a

9                    FIRST AMENDED COMPLAINT

career in entertainment, from getting stuck inside a giant birthday cake to impersonating a Madonna impersonator.

35.    Since 2014, Plaintiff has performed CONFESSIONS OF A SHOWGIRL at venues across the United States, including in Arizona, Florida, Indiana, Nevada, New Jersey, and New York. Performances have taken place at established venues such as the Laurie Beechman Theatre in New York City and Myron's at The Smith Center in Las Vegas, and have been presented to audiences numbering in the thousands. Plaintiff most recently performed the show in January 2026.

36.    A California native, Plaintiff maintains a substantial following in California, where her audience, industry relationships, and entertainment presence run deep, and where demand for the CONFESSIONS OF A SHOWGIRL show continues. Her brand reaches California consumers through her performances, her recorded and online content, and the retail channels in which her CONFESSIONS OF A SHOWGIRL works are offered.

37.    Plaintiff's show is musically directed by Keith Thompson, whose credits include *Jersey Boys*, *Mamma Mia*, and *We Will Rock You*.

38.    Plaintiff's show has been featured in entertainment publications, including *BroadwayWorld*. She has made numerous television appearances and hosted entertainment segments under the CONFESSIONS OF A SHOWGIRL name.

39.    Plaintiff has extended the CONFESSIONS OF A SHOWGIRL brand across multiple formats and consumer-facing offerings, including a published book, online video content distributed through YouTube and social media, and a podcast under the same name.

40.    Plaintiff maintains an online presence through the website www.confessionsofashowgirl.com and associated channels through which her performances, media, and related content reach the public.

41.    Plaintiff has continuously used CONFESSIONS OF A SHOWGIRL as the identifying name for her entertainment services and related works since 2014.

FIRST AMENDED COMPLAINT

42.    Through this continuous use, CONFESSIONS OF A SHOWGIRL has come to identify Plaintiff as the source of those services and has developed substantial goodwill, reflected in Plaintiff's sustained booking history and audience recognition across multiple platforms.

43.    Plaintiff owns U.S. Trademark Registration No. 4800625 for CONFESSIONS OF A SHOWGIRL in connection with entertainment services in International Class 41. That registration is valid, subsisting, and incontestable under 15 U.S.C. § 1065.

44.    CONFESSIONS OF A SHOWGIRL is inherently distinctive as applied to Plaintiff's services, and the mark's incontestable status forecloses any challenge to its validity on the ground of mere descriptiveness.

**Defendants' Adoption and Use of THE LIFE OF A SHOWGIRL**

45.    In 2025, Swift personally selected and adopted THE LIFE OF A SHOWGIRL for use in connection with a musical release and, more broadly, as a source identifier for consumer goods. Swift personally advertised it through public appearances and social media.

46.    The remaining Defendants executed the commercial program: TAS authorized, licensed, and directed the use of the designation as a trademark; UMG distributed and commercially exploited the recordings and related goods; and Bravado designed, manufactured, and sold the consumer merchandise. Together, Defendants operated as a coordinated enterprise to bring THE LIFE OF A SHOWGIRL to market as a branded line of goods.

47.    Through retail channels operated by or on behalf of Defendants, including the Taylor Swift online store, Defendants offer numerous goods identified by THE LIFE OF A SHOWGIRL, organized under a dedicated retail section labeled "THE LIFE OF A SHOWGIRL SHOP."

48.    THE LIFE OF A SHOWGIRL functions as a source identifier across a range of consumer goods, including hair brushes, flat weave towels, signet rings,

FIRST AMENDED COMPLAINT

candles, tumblers, and other personal care and home goods. The designation appears in the product names themselves: "The Life of a Showgirl Hair Brush," which bears the phrase printed on the brush itself, "The Life of a Showgirl Signet Ring," "The Life of a Showgirl Flat Weave Towel," "The Life of a Showgirl Candle," and "The Life of a Showgirl Tumbler."

49.     THE LIFE OF A SHOWGIRL also appears on the apparel itself and its packaging in the manner of a brand. On garments, it is printed where a clothing brand's name customarily identifies the source of the item—at the back of the neck on tops, and at the rear of the waistband on pants—alongside the country of origin and the registered identification number marking the goods as authentic merchandise. It also appears on the barcode stickers affixed to the goods, beside the SKU and country-of-origin information. In each location, the designation occupies the place reserved for the mark that identifies who makes the product.

50.     The commercial program extended THE LIFE OF A SHOWGIRL into consumer-facing collaborations with national brands, including Starbucks, Target, and TikTok, directing consumers to purchase goods bearing Defendants' designation.

51.     Across all of these activities, Defendants use THE LIFE OF A SHOWGIRL as a trademark and source identifier for a coordinated line of consumer goods—in the product names, labeling, packaging, and sale of those goods—not merely as the title of a creative work.

### The Relationship Between the Parties' Goods and Services

52.     The parties' goods and services are related. Plaintiff offers recorded video and digital content, a book, a podcast, and live shows under the CONFESSIONS OF A SHOWGIRL mark. Defendants use THE LIFE OF A SHOWGIRL on a line of branded consumer goods, recorded music, and digital content. Both sets of offerings are consumer-facing entertainment products and content of a kind the public associates with a single source.

53.     Both parties' offerings center on live musical performance. Plaintiff's

12                                          FIRST AMENDED COMPLAINT

show combines music, singing, and live performance; Swift's release does the same and includes cabaret versions of the songs, drawing on the same cabaret register in which Plaintiff performs.

54.    Consumers understand that entertainment marks routinely extend across formats and into adjacent categories—live performance, recorded media, film, and branded merchandise—and associate that range of uses with a common source. Plaintiff already sells CONFESSIONS OF A SHOWGIRL branded goods, including a published book, and the brand's natural zone of expansion reaches further branded merchandise, recorded music, and audiobooks—categories in which Defendants already use THE LIFE OF A SHOWGIRL.

55.    The parties reach overlapping audiences of entertainment consumers through the same channels—stage, television, online retail, social media, and internet search—including the same and similar online storefronts and platforms. A consumer who searches online for Plaintiff's CONFESSIONS OF A SHOWGIRL is now presented with results dominated by Defendants' THE LIFE OF A SHOWGIRL.

56.    The parties' shared dominant phrase, the relatedness of their entertainment offerings, their convergent channels, and Defendants' overwhelming commercial saturation make confusion as to source, affiliation, or sponsorship likely.

### The USPTO's Refusal and Defendants' Continued Use

57.    Defendants, through TAS, sought federal trademark protection for the designation THE LIFE OF A SHOWGIRL by filing U.S. Trademark Application Serial No. 99331566 with the USPTO on August 11, 2025. That application claimed priority under 15 U.S.C. § 1126(d) based on a foreign trademark application for THE LIFE OF A SHOWGIRL filed in Jamaica on May 15, 2025—three months before the album was publicly announced. Before the public had ever heard the phrase as the title of anything, then, Defendants had already moved to lock it down as a trademark, first in a foreign registry and then at home. That is not how a party protects the title of a creative work. It is how a party secures a brand.

FIRST AMENDED COMPLAINT

58.    And Defendants attempted to secure it far beyond music. The application spans fourteen international classes. One is Class 41—the same class in which Plaintiff's mark is registered—covering musical performances and live entertainment. Most of the other classes reach well beyond music into ordinary consumer goods that carry no expressive content at all, among them disposable napkins, napkin rings, pot holders, Christmas tree skirts, and shoe laces.

59.    On November 5, 2025, the USPTO issued a nonfinal Office Action refusing registration as to International Classes 9 and 41 of THE LIFE OF A SHOWGIRL under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), based on a likelihood of confusion with Plaintiff's federally registered CONFESSIONS OF A SHOWGIRL mark. The examining attorney found that the marks are identical in their shared terms "OF A SHOWGIRL," are similar in appearance and sound, and convey a similar overall commercial impression. The examining attorney further observed that THE LIFE OF A SHOWGIRL "could be viewed as an extension of" Plaintiff's brand. The examining attorney also found that the parties' goods and services are closely related, noting that both marks are used in connection with entertainment services involving live musical performances, and that consumers encountering both marks would be likely to assume a connection between the parties.[2]

60.    Plaintiff's connection to the phrase predates Defendants' use. Years before Defendants adopted it, Plaintiff used "life of a showgirl" and variations as extensions of her CONFESSIONS OF A SHOWGIRL brand, including *A Night in The Life of a Showgirl at Sea* (2014), *The Secret Life of a Showgirl* (2015), and, more recently, *Maren Wade: The Real, Raw and Unglamorous Side of The Glamorous Life of a Showgirl* (2024), used to promote her live show.

61.    Defendants are sophisticated commercial actors with dedicated legal and

---

[2] As of this filing, Defendants' application is suspended. The USPTO has maintained its likelihood-of-confusion refusal based on Plaintiff's registered CONFESSIONS OF A SHOWGIRL mark and has indicated that the refusal will be made final once the suspension lifts.

FIRST AMENDED COMPLAINT

brand management teams for whom trademark clearance is routine. A standard search would have revealed Plaintiff's federally registered mark and her longstanding prior use in commerce. Defendants are also among trademark law's most active enforcers. Through Swift and TAS, they have filed multiple federal actions seeking injunctive relief and seizure orders against the sale of merchandise bearing their designations. They know, from their own enforcement, exactly what trademark infringement is and what it costs the owner of a mark.

62. Defendants had that knowledge here. They knew of Plaintiff's registered mark, and the USPTO told them their designation was likely to be confused with it. They continued anyway—Swift promoting the designation, UMG distributing the recordings and related goods, and Bravado manufacturing and selling the merchandise—and they expanded that use rather than stopping it.

63. At no point have Defendants sought or obtained Plaintiff's consent or authorization to use THE LIFE OF A SHOWGIRL or any similar designation.

64. Through Defendants' substantially greater commercial scale and retail reach, including a global merchandising operation and national brand collaborations, goods bearing the designation have been widely offered and sold to consumers. THE LIFE OF A SHOWGIRL sold more than four million U.S. album-equivalent units in its first week, a debut Defendants have described as the largest first week of sales in modern music history.

65. Defendants' use of THE LIFE OF A SHOWGIRL is ongoing and expanding. Swift continues to advertise, Bravado continues to manufacture and sell, and UMG continues to distribute, goods bearing the designation through retail channels reaching consumers nationwide. Each additional sale compounds the confusion in the marketplace and further erodes Plaintiff's ability to be recognized as the sole source of her CONFESSIONS OF A SHOWGIRL brand. The harm to Plaintiff's goodwill is not fully compensable through monetary damages.

66. As a result, consumers encountering Plaintiff's CONFESSIONS OF A

FIRST AMENDED COMPLAINT

SHOWGIRL mark—including through search engines and online platforms where Defendants' content now dominates the results—are likely to believe that her services originate with, are affiliated with, or are authorized by Defendants. Worse, they increasingly perceive her decade-old original as derived from Defendants' later release: a tribute trading on THE LIFE OF A SHOWGIRL, much as audiences understand "Purple Reign" to be a tribute to Prince's "Purple Rain."

67. Plaintiff has felt the consequences of this reverse confusion directly: as a solo performer in the same entertainment space, she has had to navigate the wave of consumer attention Defendants' program generated and to maintain her presence in a conversation and a marketplace Defendants had overtaken.

68. Defendants' use of THE LIFE OF A SHOWGIRL, backed by the substantial commercial infrastructure of Swift, TAS, UMG, and Bravado and amplified through national brand collaborations reaching millions of consumers, has threatened to overwhelm Plaintiff's senior mark and to impair Plaintiff's ability to control the identity and goodwill associated with her brand.

69. THE LIFE OF A SHOWGIRL is one designation among more than 175 active or pending trademark registrations managed by TAS on behalf of Swift, spanning names, phrases, and commercial designations across one of the most extensive trademark portfolios in the entertainment industry. Defendants' broader enterprise does not depend on the continued use of any single designation. By contrast, CONFESSIONS OF A SHOWGIRL is the sole trademark under which Plaintiff has built her professional identity for more than a decade. It is not one mark among hundreds. It is the only one she has. The continued erosion of that mark threatens the entirety of Plaintiff's brand.

70. Defendants adopted THE LIFE OF A SHOWGIRL with knowledge of Plaintiff's federally registered mark, continued to expand their use after the USPTO refused their application on likelihood-of-confusion grounds, and have at no point sought Plaintiff's consent. Plaintiff is entitled to relief.

FIRST AMENDED COMPLAINT

## COUNT I: TRADEMARK INFRINGEMENT
## 15 U.S.C. § 1114

### (*Against All Defendants*)

71.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

72.     Each Defendant is liable for infringement of Plaintiff's mark under 15 U.S.C. § 1114, whether as a direct infringer or, in the alternative, as a contributory or vicarious infringer, as set forth below.

73.     Plaintiff is the owner of U.S. Trademark Registration No. 4800625 for the mark CONFESSIONS OF A SHOWGIRL, registered on the Principal Register of the USPTO in connection with entertainment services.

74.     Plaintiff's registration is valid, subsisting, and in full force and effect, and has achieved incontestable status pursuant to 15 U.S.C. § 1065.

75.     Through continuous use in commerce since at least 2014, the CONFESSIONS OF A SHOWGIRL mark has come to identify Plaintiff as the source of the services and related offerings provided under that name and embodies substantial goodwill.

76.     THE LIFE OF A SHOWGIRL has been used and continues to be used in commerce as a source-identifying trademark in connection with goods offered for sale to consumers. Each Defendant contributed a distinct role in that use: Swift personally selected, approved, and promoted the designation; TAS owns the designation and licensed and authorized its use as a mark; UMG distributed and commercially exploited the goods bearing it; and Bravado designed, manufactured, and sold those goods.

77.     To the extent any Defendant is found not to have directly used THE LIFE OF A SHOWGIRL in commerce within the meaning of 15 U.S.C. § 1114, that Defendant is liable for contributory or vicarious infringement. TAS owns the trademark rights in the designation. With knowledge of Plaintiff's registered mark and the conflict the USPTO identified, TAS authorized and licensed UMG and Bravado to use the designation as a trademark on the goods sold to consumers, intentionally

17                                              FIRST AMENDED COMPLAINT

inducing and materially contributing to their infringing use. TAS is also vicariously liable: it retained and exercised the right and ability to control that use and shares in the revenue the infringing goods generate. The same is true of any other Defendant that, knowing of Plaintiff's rights, induced or materially contributed to another's infringing use, or had both the right to control that use and a financial stake in it.

78. Defendants' use of THE LIFE OF A SHOWGIRL has occurred without Plaintiff's authorization.

79. THE LIFE OF A SHOWGIRL is confusingly similar to Plaintiff's CONFESSIONS OF A SHOWGIRL mark in sight, sound, and commercial impression. Considered in their entireties, both marks are built on the identical construction "[___] OF A SHOWGIRL," share the dominant, terminal phrase OF A SHOWGIRL, and convey the same connotation of an intimate, behind-the-scenes account of a showgirl's life. Because Plaintiff's mark is registered in standard characters, her rights are not limited to any particular font, color, or stylization, and Defendants cannot avoid the similarity of the marks through their choice of design or coloration.

80. The parties' goods and services are related. Both parties offer overlapping categories of consumer goods and content—including branded goods, recorded and digital media, and live entertainment—to the same consumers through the same retail and online channels. Entertainment brands of this kind are understood to span formats. A live show, a recording, a film, and a line of merchandise are all taken to emanate from a single source, so consumers encountering CONFESSIONS OF A SHOWGIRL and THE LIFE OF A SHOWGIRL across these categories will assume a common origin. The USPTO so found in refusing Defendants' application, concluding that the parties' goods and services are closely related.

81. Defendants' use of THE LIFE OF A SHOWGIRL in connection with goods offered to consumers is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association between the parties. Given Defendants' substantially greater commercial scale, that confusion is likely to run in reverse:

FIRST AMENDED COMPLAINT

consumers will believe that Plaintiff's senior CONFESSIONS OF A SHOWGIRL brand is affiliated with, sponsored by, a tribute to, or derived from Defendants.

82.    Consumers have, in fact, been confused as to the affiliation, connection, or association between Plaintiff's brand and Defendants' use of THE LIFE OF A SHOWGIRL. In the brief period of concurrent use, multiple instances of actual consumer confusion have been documented across public platforms, including consumers who have referred to Defendants' goods by Plaintiff's mark. Online searches for Plaintiff's mark now return results dominated by content associated with Defendants' designation, compounding consumer confusion at the point of search.

83.    Defendants' pervasive use of the TAYLOR SWIFT name and brand alongside THE LIFE OF A SHOWGIRL does not dispel the resulting confusion. In the context of Defendants' overwhelming commercial presence, it reinforces the mistaken association by leading consumers to believe that Plaintiff's senior CONFESSIONS OF A SHOWGIRL brand originates with, is affiliated with, is a tribute to, or is sponsored by Defendants.

84.    In a reverse confusion case of this kind, the controlling question is whether the junior user's commercial strength is so great as to overtake and swamp the senior user's mark. Defendants' commercial use of THE LIFE OF A SHOWGIRL is of an entirely different order of magnitude than Plaintiff's, and it is likely to swamp the source-identifying capacity of Plaintiff's senior mark.

85.    Defendants had constructive notice of Plaintiff's registration under 15 U.S.C. § 1072, and actual notice once the USPTO identified the likelihood of confusion with Plaintiff's mark. Defendants, sophisticated parties with dedicated trademark teams, proceeded with and expanded their use anyway. Their infringement was not inadvertent. It was deliberate.

86.    Defendants' acts constitute trademark infringement in violation of 15 U.S.C. § 1114.

87.    As a direct and proximate result of Defendants' infringement, Plaintiff has

19                    FIRST AMENDED COMPLAINT

suffered and will continue to suffer irreparable harm to her business, reputation, and goodwill, including impairment of the source-identifying function of her mark in the marketplace and displacement of her brand in the digital channels through which she reaches her audience. There is no adequate remedy at law.

88.     Plaintiff is entitled to injunctive relief pursuant to 15 U.S.C. § 1116 and to recover Defendants' profits, Plaintiff's damages, and the costs of this action pursuant to 15 U.S.C. § 1117.

89.     Because Defendants acted with knowledge of Plaintiff's rights, this is an exceptional case entitling Plaintiff to recover attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT II: FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION
### 15 U.S.C. § 1125(a)

### (*Against All Defendants*)

90.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

91.     Each Defendant is liable for false designation of origin and unfair competition under 15 U.S.C. § 1125(a), whether as a direct participant or, in the alternative, as a contributory or vicarious infringer, as set forth below.

92.     Plaintiff has used the CONFESSIONS OF A SHOWGIRL mark in commerce in connection with entertainment services and related offerings since 2014.

93.     Through continuous use in commerce, the CONFESSIONS OF A SHOWGIRL mark has come to identify Plaintiff as the source of those services and has acquired substantial goodwill.

94.     THE LIFE OF A SHOWGIRL has been used and continues to be used in commerce as a trademark in connection with goods offered for sale to consumers. Defendants each acted in their respective roles: Swift selected, approved, and promoted the designation; TAS owns the designation and licensed and authorized its use as a mark; UMG distributed and commercially exploited the goods bearing it; and Bravado

FIRST AMENDED COMPLAINT

designed, manufactured, and sold those goods.

95. To the extent any Defendant is found not to have used THE LIFE OF A SHOWGIRL in commerce directly within the meaning of 15 U.S.C. § 1125(a), that Defendant is liable for contributory or vicarious false designation of origin and unfair competition. TAS owns the trademark rights in the designation. With knowledge of Plaintiff's registered mark and the conflict the USPTO identified, TAS authorized and licensed UMG and Bravado to use the designation as a mark on goods sold to consumers, intentionally inducing and materially contributing to their infringing use. TAS is also vicariously liable: it retained and exercised the right and ability to control that use and shares in the revenue the infringing goods generate. The same is true of any other Defendant that, knowing of Plaintiff's rights, induced or materially contributed to another's infringing use, or had both the right to control that use and a financial stake in it.

96. THE LIFE OF A SHOWGIRL is confusingly similar to Plaintiff's mark, and the parties' goods and services are related, as alleged above.

97. Defendants' use of THE LIFE OF A SHOWGIRL is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or association of Plaintiff's services, including by causing consumers to attribute Plaintiff's brand to Defendants.

98. Defendants' substantially greater commercial scale is likely to compound that confusion by causing consumers to believe that Plaintiff's CONFESSIONS OF A SHOWGIRL brand is derived from or subordinate to Defendants' brand—the hallmark of reverse confusion.

99. Defendants' conduct threatens to overwhelm Plaintiff's senior mark and impair Plaintiff's ability to control the identity and goodwill associated with her brand.

100. By reason of the foregoing, Defendants have engaged in false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

101. As a direct and proximate result of Defendants' conduct, Plaintiff has

FIRST AMENDED COMPLAINT

suffered and will continue to suffer irreparable harm to her business, reputation, and goodwill, for which there is no adequate remedy at law.

102. Plaintiff is entitled to injunctive relief pursuant to 15 U.S.C. § 1116, and to recover Defendants' profits, Plaintiff's damages, and the costs of this action pursuant to 15 U.S.C. § 1117.

103. Defendants' conduct has been willful, rendering this an exceptional case entitling Plaintiff to recover attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT III: UNFAIR COMPETITION
## CAL. BUS. & PROF. CODE §§ 17200 *et seq.*
### (*Against All Defendants*)

104. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

105. California Business and Professions Code § 17200 prohibits unlawful and unfair business acts and practices.

106. The conduct giving rise to this claim occurred in and emanated from California. UMG maintains its principal place of business in Santa Monica, California, and conducts from there the distribution and commercial exploitation of the goods bearing THE LIFE OF A SHOWGIRL, placing them into the California market through digital platforms and physical retailers in this State. Bravado is a California corporation headquartered in Santa Monica, California, and carries out from there its design, manufacturing, merchandising, marketing, and sales operations for the goods bearing the designation. The wrongful conduct underlying this claim—the design, branding, manufacture, marketing, distribution, and sale of the infringing goods—thus materialized through functions UMG and Bravado perform from California, and the goods were sold from California to consumers in California and nationwide.

107. Swift directed the promotion of the infringing designation into California, doing so through her own conduct: she wrote and directed the music video for the album's lead single and filmed it in Los Angeles; she shot photography for her merchandise in Los Angeles; she publicly invited consumers to attend the California

FIRST AMENDED COMPLAINT

theatrical exhibition of her release-party film; she funded and drove the promotion of the designation, which targeted the California market through fan activations and physical billboards; and she appeared in person in Los Angeles at the 2026 iHeartRadio Music Awards to promote THE LIFE OF A SHOWGIRL. TAS, as owner of the mark, authorized and licensed the exploitation of the designation through its California-based affiliates and directed that exploitation into California. The wrongful conduct underlying this claim was thus conceived, authorized, executed, and carried out in substantial part in California, and Plaintiff's resulting injury is felt in substantial part in California, where she maintains an established audience, industry relationships, and prospective business.

108. Defendants have engaged in unlawful business acts and practices by committing the acts of trademark infringement and false designation of origin alleged above, including violations of 15 U.S.C. §§ 1114 and 1125(a).

109. Defendants' conduct is also unfair within the meaning of Cal. Bus. & Prof. Code § 17200. By deploying THE LIFE OF A SHOWGIRL as a trademark on consumer goods at overwhelming commercial scale, Defendants have saturated the market to the point that consumers can no longer reliably identify the source of goods offered under Plaintiff's senior CONFESSIONS OF A SHOWGIRL mark, and have in fact begun attributing Plaintiff's mark to Defendants. That confusion harms competition itself: it corrupts the source-identifying function on which the competitive market depends, deprives consumers of the ability to make informed source-based choices, and allows a dominant junior user to displace the goodwill of a senior mark through sheer commercial scale, substituting market power for fair competition. Such conduct violates the policy and spirit of state and federal trademark law, whose central purpose is to prevent consumer confusion as to source and to preserve fair competition, and its effects are comparable to the harms those laws condemn. The gravity of that harm to consumers and to competition is not outweighed by any legitimate justification, particularly where Defendants could have adopted any of countless non-

FIRST AMENDED COMPLAINT

infringing designations.

110. Through the acts alleged herein, Defendants have gained an unfair advantage in the marketplace and distorted the fair competition that state and federal trademark law exist to protect.

111. As a direct and proximate result of Defendants' acts, Plaintiff has suffered injury in fact and has lost money or property, including through impairment of her ability to control and expand the CONFESSIONS OF A SHOWGIRL brand, the diminished value of her federally registered CONFESSIONS OF A SHOWGIRL mark as a property interest, loss of control over the mark's source-identifying function in the marketplace, and displacement of her brand in the digital channels through which she reaches her audience. That injury extends to Plaintiff's established California business interests: she maintains a California audience and ongoing industry relationships, has prospective California performance engagements, and is developing a project with a Los Angeles-based production company—all of which depend on the goodwill and source-identifying capacity of the CONFESSIONS OF A SHOWGIRL mark that Defendants' conduct has impaired.

112. Defendants' acts have caused, and unless restrained will continue to cause, substantial injury to Plaintiff's business, reputation, and goodwill.

113. Unless enjoined by this Court, Defendants will continue to engage in the unlawful and unfair acts and practices alleged herein.

114. Plaintiff lacks an adequate remedy at law for the relief she seeks under this claim. The injury Defendants' conduct inflicts is continuing and prospective: each day of continued use further erodes the source-identifying function of Plaintiff's mark, compounds consumer confusion, and threatens the destruction of goodwill built over more than a decade. An award of damages cannot halt Defendants' ongoing conduct, cannot prevent the future confusion that conduct will generate, and cannot restore a mark's capacity to identify its source once that capacity is lost. Only prospective injunctive relief can prevent that irreparable, ongoing injury.

FIRST AMENDED COMPLAINT

115. Plaintiff is entitled to injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203, and to restitution to the extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

1. For a permanent injunction pursuant to 15 U.S.C. § 1116 and Cal. Bus. & Prof. Code § 17203 enjoining Defendants and their officers, agents, servants, employees, attorneys, successors, assigns, and all persons acting in concert or participation with them, from using THE LIFE OF A SHOWGIRL, or any other mark confusingly similar to Plaintiff's CONFESSIONS OF A SHOWGIRL mark, as a trademark or other source-identifying designation in connection with goods or services in a manner likely to cause confusion;

2. For preliminary injunctive relief during the pendency of this action, as sought in Plaintiff's pending motion for a preliminary injunction, restraining Defendants from using THE LIFE OF A SHOWGIRL, or any confusingly similar designation, as a trademark or source-identifying designation in connection with goods or services;

3. For an order requiring Defendants to cease and permanently discontinue all use of THE LIFE OF A SHOWGIRL, or any confusingly similar designation, as a trademark or source-identifying designation in connection with any goods or services;

4. For an accounting and disgorgement of all profits earned by Defendants attributable to their use of THE LIFE OF A SHOWGIRL, or any confusingly similar designation, including profits derived from the sale of goods bearing that designation and other source-identifying uses thereof, pursuant to 15 U.S.C. § 1117;

5. For an award of Plaintiff's actual damages sustained as a result of Defendants' unlawful conduct;

6. For treble damages, where appropriate, pursuant to 15 U.S.C. § 1117;

7. For restitution, to the extent permitted by law, and other equitable relief

25                                                          FIRST AMENDED COMPLAINT

pursuant to Cal. Bus. & Prof. Code § 17203;

   8.    For an award of Plaintiff's costs of suit;

   9.    For an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a) on the ground that this is an exceptional case; and

   10.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all issues so triable.


DATED: June 16, 2026                    */s/ Jaymie Parkkinen*
                                         Jaymie Parkkinen

                                         *Counsel for Plaintiff*

FIRST AMENDED COMPLAINT