# Exhibit 1

**To:** Rebecca Liebowitz(trademarkdocketing@venable.com)
**Subject:** U.S. Trademark Application Serial No. 99331566 - THE LIFE OF A SHOWGIRL - - 124909-615253
**Sent:** September 22, 2026 10:43:58 PM EDT
**Sent As:** tmng.notices@uspto.gov

**Attachments**

8277122
screencapture-www-rituals-com-en-us-search-17901284322261
screencapture-www-rituals-com-en-us-home-collection-scented-candles-classic-scented-candles-17901284763321
screencapture-www-tous-com-us-en-sale-c-4100-17901286319131
Camarillo_Instruction_Manual.pdf
CoachA.png
CoachB.png
CoachC.png
TousA.png
TousB.png
TousC.png
CKA.png
CKB.png
screencapture-www-rollingstone-com-product-recommendations-lifestyle-best-celebrity-fragrances-by-musicians-1084704-17901294920331
screencapture-perfumesociety-org-perfume-house-bvlgari-17901297273781
screencapture-en-wikipedia-org-wiki-Diptyque-17901297957061

## United States Patent and Trademark Office (USPTO)

**Office Action (Official Letter) About Applicant's Trademark Application**

**U.S. Application Serial No.** 99331566

**Mark:** THE LIFE OF A SHOWGIRL

**Correspondence Address:**
Rebecca Liebowitz
Venable LLP
P.O. Box 34385
Washington DC 20043-9998
United States

**Applicant:** TAS Rights Management, LLC

**Reference/Docket No.** 124909-615253

**Correspondence Email Address:** trademarkdocketing@venable.com

# NONFINAL OFFICE ACTION

**Response deadline.** File a response to this nonfinal Office action within three months of the "Issue date" below to avoid abandonment of the application. Review the Office action and respond using one of the links to the appropriate electronic forms in the "How to respond" section below.

**Request an extension.** For a fee, applicant may request one three-month extension of the response deadline prior to filing a response. The request must be filed within three months of the "Issue date" below. If the extension request is granted, the USPTO must receive applicant's response to this letter within six months of the "Issue date" to avoid abandonment of the application.

**Issue date:** September 22, 2026

This is further to the Suspension Letter of March 3, 2026.

STATUS: The application was suspended pending the resolution of U.S. application serial no. 98905117, which had an earlier filing date than the present application. The mark in the prior pending application registered and now presents a bar to registration of the present application. Please see below for details. Additionally, the Section 2(d) refusal based on Reg. no. 4800625 is maintained and continued. Furthermore, the examining attorney issues a requirement to clarify the filing basis of the application and its intention to either remain with one filing basis or add 44(e). Finally, the identification clarification requirement is maintained and continued.

REFUSAL - TRADEMARK ACT SECTION 2(D) - LIKELIHOOD OF CONFUSION

Registration of the applied-for mark was refused as to International Classes 9 and 41 because of a likelihood of confusion with the mark in U.S. Registration No. 4800625 (CONFESSIONS OF A SHOWGIRL). Trademark Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq.* *See* previously attached registration. Applicant has not presented any arguments in favor of withdrawing this refusal. Therefore, the examining attorney herein incorporates by reference the arguments presented in the November 5, 2025 Office Action, and maintains and continues the refusal.

Registration of the applied-for mark is now also refused as to International Classes 4, 14, 18, 25, and 35 because of a likelihood of confusion with the mark in U.S. Registration No. 8277122 (SHOWGIRL). Trademark Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq.* *See* the attached registration.

Trademark Act Section 2(d) bars registration of an applied-for mark that is so similar to a registered mark that it is likely consumers would be confused, mistaken, or deceived as to the commercial source of the goods and/or services of the parties. *See* 15 U.S.C. §1052(d). Likelihood of confusion is determined on a case-by-case basis by applying the factors set forth

in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) (called the "*du Pont* factors"). *In re i.am.symbolic, llc*, 866 F.3d 1315, 1322, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017). Any evidence of record related to those factors need be considered; however, "not all of the *DuPont* factors are relevant or of similar weight in every case." *In re Guild Mortg. Co.*, 912 F.3d 1376, 1379, 129 USPQ2d 1160, 1162 (Fed. Cir. 2019) (quoting *In re Dixie Rests., Inc.*, 105 F.3d 1405, 1406, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997)).

Although not all *du Pont* factors may be relevant, there are generally two key considerations in any likelihood of confusion analysis: (1) the similarities between the compared marks and (2) the relatedness of the compared goods and/or services. *See In re i.am.symbolic, llc*, 866 F.3d at 1322, 123 USPQ2d at 1747 (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1164-65, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002)); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103, 192 USPQ 24, 29 (C.C.P.A. 1976) ("The fundamental inquiry mandated by [Section] 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences in the marks."); TMEP §1207.01.

The overriding concern is not only to prevent buyer confusion as to the source of the goods and/or services, but to protect the registrant from adverse commercial impact due to use of a similar mark by a newcomer. *See In re Shell Oil Co.*, 992 F.2d 1204, 1208, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993). Therefore, any doubt regarding a likelihood of confusion determination is resolved in favor of the registrant. TMEP §1207.01(d)(i); *see Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265, 62 USPQ2d 1001, 1003 (Fed. Cir. 2002); *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 464-65, 6 USPQ2d 1025, 1026 (Fed. Cir. 1988).

**Comparison of the Marks**

Marks are compared in their entireties for similarities in appearance, sound, connotation, and commercial impression. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 1321, 110 USPQ2d 1157, 1160 (Fed. Cir. 2014) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1371, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005)); TMEP §1207.01(b)-(b)(v). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018) (citing *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)), *aff'd per curiam*, 777 F. App'x 516, 2019 BL 343921 (Fed. Cir. 2019); TMEP §1207.01(b).

In the instant case, the applicant's mark "THE LIFE OF A SHOWGIRL" is highly similar to the registrant's mark "SHOWGIRL". The marks share terms in common, namely, SHOWGIRL.

In fact, the addition of a term to a registered mark has often been found to increase the similarity between the compared marks where, as in the present case, the dominant portion of the marks is the same. *See In re Charger Ventures LLC*, 64 F.4th 1375, 1381-82, 2023 USPQ2d 451, at *4-5 (Fed. Cir. 2023) (holding SPARK and SPARK LIVING confusingly similar); *Coca-Cola Bottling Co. v. Jos. E. Seagram & Sons, Inc.*, 526 F.2d 556, 557, 188 USPQ 105, 106 (C.C.P.A. 1975) (holding BENGAL and BENGAL LANCER and design confusingly similar); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1269 (TTAB 2009) (holding TITAN and VANTAGE TITAN confusingly similar); *In re El Torito Rests., Inc.*, 9 USPQ2d 2002, 2004 (TTAB 1988) (holding MACHO and MACHO COMBOS confusingly similar); TMEP

§1207.01(b)(iii). Here, the addition of THE LIFE OF A reinforces the connotation of the term "SHOWGIRL" as it is used in the registration.

Moreover, marks may be confusingly similar in appearance where similar terms or similar parts of terms appear in the compared marks and create a similar overall commercial impression. *See Crocker Nat'l Bank v. Canadian Imperial Bank of Com.*, 228 USPQ 689, 690-91 (TTAB 1986) (holding COMMCASH and COMMUNICASH confusingly similar), *aff'd sub nom. Canadian Imperial Bank of Com. v. Wells Fargo Bank, N.A.*, 811 F.2d 1490, 1492, 1495, 1 USPQ2d 1813, 1814-15, 1817 (Fed. Cir. 1987); *In re Corning Glass Works*, 229 USPQ 65, 66 (TTAB 1985) (holding CONFIRM and CONFIRMCELLS confusingly similar); *In re Pellerin Milnor Corp.*, 221 USPQ 558, 560 (TTAB 1983) (holding MILTRON and MILLTRONICS confusingly similar); *Sun Elec. Corp. v. Sun Oil Co.*, 196 USPQ 450, 452 (TTAB 1977) (holding SUNELECT and SUN ELECTRIC confusingly similar); *In re BASF Aktiengesellschaft*, 189 USPQ 424, 424 (TTAB 1976) (holding LUTEX and LUTEXAL confusingly similar); TMEP §1207.01(b)(ii)-(iii).

Here, the marks are identical in part. Applicant's mark creates a confusingly similar commercial impression with the registered mark because they share the identical term SHOWGIRL. The consumer is likely to focus on the dominant noun in the proposed mark, the term SHOWGIRL, which contributes more to the commercial impression of the mark. In fact, the proposed mark could be viewed as an extension of the registrant's brand.

With this in mind, and considered in their entireties, the marks are more similar than dissimilar in appearance and sound, so that, when viewed as a whole, the marks engender a similar overall commercial impression. The similarities between the marks make a greater impression upon purchasers. Based on the above, the marks are similar and convey a similar overall commercial impression.

**Comparison of the Goods and Services**

The goods and/or services are compared to determine whether they are similar, commercially related, or travel in the same trade channels. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369-71, 101 USPQ2d 1713, 1722-23 (Fed. Cir. 2012); *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1165, 64 USPQ2d 1375, 1381 (Fed. Cir. 2002); TMEP §§1207.01, 1207.01(a)(vi). The compared goods and/or services need not be identical or even competitive to find a likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000); TMEP §1207.01(a)(i). They need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [the goods and/or services] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); TMEP §1207.01(a)(i); *see Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *18 (TTAB 2022) (quoting *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006)).

When analyzing an applicant's and registrant's goods and/or services for similarity and relatedness, that determination is based on the description of the goods and/or services in the

application and registration at issue, not on extrinsic evidence of actual use. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 1323, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) (quoting *Octocom Sys. Inc. v. Hous. Computers Servs. Inc.*, 918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990)).

Here, the relevant goods and services in the application are:

International Class 004: (Based on Intent to Use and 44(d)) Candles
International Class 014: (Based on Intent to Use and 44(d)) Jewelry; Jewelry boxes; Lapel pins; Clocks; Watches; Key chains; Jewelry dishes; (Based on Intent to Use) Jewelry charms; Bracelets; Rubber or silicone wristbands in the nature of a bracelet; Jewelry cases; Fitted jewelry pouches; Jewelry rolls; Jewelry making kits; Watch straps
International Class 018: (Based on Intent to Use and 44(b)) All-purpose carrying bags; Back packs; Handbags; (Based on Intent to Use) Drawstring bags; Messenger bags; Reusable shopping bags; Textile shopping bags; Tote bags; Cosmetic bags sold empty; Luggage; Baggage tags; Purses; Wallets; Key wallets; Key pouches; Drawstring pouches; Pouches made from imitation leather; Pouches of textile; Umbrellas; Luggage tags
International Class 025: (Based on Intent to Use and 44(d)) Tops as clothing; Sweaters; Sweatshirts; Hooded pullovers; Bottoms as clothing; Pants; Dresses; Coats; Loungewear; Pajamas; Gloves as clothing; Scarves; Bandanas; Headwear; Socks; Sleep masks; (Based on Intent to Use) Tank tops; Shirts; T-shirts; Short-sleeve shirts; Clothing jerseys; Pullovers; Sweatpants; Shorts; Skirts; Clothing jackets; Ponchos; Vests; Sleepwear; Bathrobes; Coverups; Hosiery; Hats; Headbands; Footwear; Shoes; Jeans; Clothing belts; Aprons
International Class 035: (Based on Intent to Use and 44(d)) Retail store services featuring a wide variety of consumer goods; Online retail store services featuring a wide variety of consumer goods; (Based on Intent to Use) Retail store services featuring consumer products in the fields of music and musical entertainment; On-line retail store services featuring consumer products in the fields of music and musical entertainment; Retail store services featuring a wide variety of consumer products relating to a musical artist and an entertainer; On-line retail store services featuring a wide variety of consumer products relating to a musical artist and an entertainer; Promoting the goods and services of others via a global computer network; Dissemination of advertising for others via the Internet

The goods in the registration are:
International Class 003: Fragrances; Perfume; Eau de perfume

The compared goods and/or services need not be identical or even competitive to find a likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000); TMEP §1207.01(a)(i). They need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [the goods and/or services] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); TMEP §1207.01(a)(i).

Turning to the relatedness of the goods and services, an analysis of the parties' goods and

services, as well as their trade channels reveals that these goods and services are considered related for likelihood of confusion purposes.

Relatedness is proven based on evidence of common source with marketplace examples illustrating that the goods can come from the same source and are generally identified by the same mark. The attached Internet evidence, consisting of website screenshots, establishes that the same entity commonly manufactures, produces, or provides the relevant goods and markets them under the same mark.

For instance, Rituals and Dyptique manufacture and are the source of both perfumes in class 3 and candles in class 4 under its brand. (*See* attachments from <rituals.com> and <Wikipedia.com>). Thus, applicant and registrant's goods are considered related for likelihood of confusion purposes. *See, e.g.*, *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202-04 (TTAB 2009); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009).

Tous and Coach are two entities in the jewelry and bags industry that manufacture both class 3 fragrances and perfumes, as well as class 14 jewelry and class 18 handbags, under their brand. (*See* attachments from <Tous.com> and <Coach.com>). Thus, applicant and registrant's goods are considered related for likelihood of confusion purposes. *See, e.g.*, *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202-04 (TTAB 2009); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009). Bulgari is an additional example of an entity that manufactures perfumes, as well as class 14 jewelry under its brand. See attachment from <perfumesociety.org>).

Calvin Klein, manufactures and is the source of both class 3 fragrances and classes 25 clothing and class 35 retail store services, under its brand. (*See* attachments from <CalvinKlein.us>). Thus, it is common for consumers to see fragrances and clothing coming from the same source. As such, applicant and registrant's goods are considered related for likelihood of confusion purposes. *See, e.g.*, *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202-04 (TTAB 2009); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009).

Also as to Class 35 specifically, the use of similar marks on or in connection with both products and retail-store services has been held likely to cause confusion where the evidence showed that the retail-store services featured the same type of products. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1307, 128 USPQ2d 1047, 1051 (Fed. Cir. 2018) (holding the use of similar marks for various clothing items, including athletic uniforms, and for retail shops featuring sports team related clothing and apparel likely to cause confusion); *In re Country Oven, Inc.*, 2019 USPQ2d 443903, at *12 (TTAB 2019) (holding the use of identical marks for bread buns and retail bakery stores and shops likely to cause confusion); *In re House Beer, LLC*, 114 USPQ2d 1073, 1078 (TTAB 2015) (holding the use of identical marks for beer and for retail store services featuring beer likely to cause confusion); TMEP §1207.01(a)(ii). Here, the registration use(s) broad wording to describe its retail services, which presumably encompasses a variety of goods, since it refers to broad wording like "widevariety of consumer products" and "consumer products relating to am musical artist," that could include goods like the ones in the registration, namely fragrances, and perfumes, *e.g.*, *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *18 (TTAB 2022); *In re Solid State Design Inc.*, 125 USPQ2d 1409, 1412-15 (TTAB 2018); *Sw.*

*Mgmt., Inc. v. Ocinomled, Ltd.*, 115 USPQ2d 1007, 1025 (TTAB 2015). The attached articles describe common merchandise affiliated to a musical artist, and reveals that custom fragrances is one such type. *See* attached article from <rollingstone.com>.

This evidence shows the goods and services listed in the application and registration are considered to be related because they can come from the same source and be identified by the same mark.

Moreover, the marks are identical in part. Generally, the greater the degree of similarity between the applied-for mark and the registered mark, the lesser the degree of similarity between the goods and/or services of the parties is required to support a finding of likelihood of confusion. *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *44 (TTAB 2022) (quoting *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1440 (TTAB 2012)); *In re C.H. Hanson Co.*, 116 USPQ2d 1351, 1353 (TTAB 2015) (citing *In re Opus One Inc.*, 60 USPQ2d 1812, 1815 (TTAB 2001)); *In re House Beer, LLC*, 114 USPQ2d 1073, 1077 (TTAB 2015); TMEP §1207.01(a).

As such, in the eyes of the purchasing public, the trademarks will be confusingly similar since it can appear that the proposed mark identifies a line of candles, jewelry, bags, clothing and retail store services in registrant's already existing line of fragrances and perfumes, a natural extension of the product line. Thus, purchasers familiar with registrant's mark SHOWGIRL for fragrances and perfumes, upon encountering applicant's products offered under the very similar mark THE LIFE OF A SHOWGIRL, are likely to believe that registrant is authorizing applicant's use of the mark, and assume that applicant's goods and services are therefore licensed by or in some way associated with registrant.

Purchasers of applicant's goods could mistakenly assume such goods and services were produced and/or offered by registrant, or that applicant and registrant are related in some way. Accordingly, since the marks are confusingly similar and the goods are closely related, there is a likelihood of confusion and registration must be refused under Section 2(d) of the Trademark Act.

Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration. If applicant responds to the refusal(s), applicant must also respond to the requirement(s) set forth below.

## DUAL FILING BASIS AND CLAIM OF PRIORITY CLARIFICATION

Applicant submitted a claim of priority under Section 44(d) on October 22, 2025 but was silent on whether applicant intends to rely on both 1(b) and 44(e). When an application is silent as to whether the applicant intends to rely on §44(e) as an additional basis for registration, the examining attorney must inquire as to whether the applicant intends to rely on the §44(e) basis. Please specify whether applicant intends to rely on and perfect §44(e) as an additional basis. If so, the foreign registration is required.

## IDENTIFICATION REQUIREMENT

Applicant has not addressed the identification requirement. Therefore, the following is maintained and continued.

Some of the wording in the identification of goods and/or services is indefinite and/or overly broad; that is, it is not clear what the nature of the goods and/or services is and/or the identification could include goods and/or services in more than one international class. The identification of goods and/or services must be specific, definite, clear, accurate, and concise. See 15 U.S.C. §§1051(a)(2), 1051(b)(2), 1053, 1126(d)-(e), 1141f; 37 C.F.R. §2.32(a)(6); TMEP §§1402.01, 1402.01(b)-(c).

Therefore, applicant must either (1) delete the unacceptable wording or (2) amend it to definite wording that specifies the nature of the goods and/or services in greater detail and that is within the scope of the original identification. See 37 C.F.R. §2.32(a)(6); TMEP §§1402.01, 1402.03.

Applicant is in the best position to know their goods and/or services, and the ID Manual is a good resource for finding an appropriate amendment. Note that the identification must not be in narrative form, but rather, an understandable description of the goods and services, which is done by using the common commercial name for the goods [and/or services]." In re Gulf Coast Nutritionals, Inc., 106 USPQ2d 1243, 1247 (TTAB 2013) (citing In re Sones, 590 F.3d 1282, 1289, 93 USPQ2d 1118, 1124 (Fed. Cir. 2009)). If there is no common, ordinary name for the goods and/or services, applicant should describe the goods and/or services using wording that would be generally understood by the average person. *See Schenley Indus., Inc. v. Battistoni*, 112 USPQ 485, 486 (Comm'r Pats. 1957); *Cal. Spray-Chem. Corp. v. Osmose Wood Pres. Co. of Am.*, 102 USPQ 321, 322 (Comm'r Pats. 1954); TMEP §1402.01.

Please follow along the wording in bold and underlined, which requires clarification, including explanations, stricken wording, and suggested amendments in parentheses.

*International Class 009*: (Based on Intent to Use and 44(b)) Musical sound recordings; Downloadable musical sound recordings; Musical video recordings; Cases for mobile phones; Grip holders for mobile phones; Compact disc storage containers; Sunglasses; Downloadable electronic sheet music; Earbud cases; Refrigerator magnets; Turntable slipmats; Audio cassettes featuring music; Audio and video recordings **<u>featuring entertainment</u>**, music, stories, dramatic performances, and non-dramatic performances; Digital media, namely, pre-recorded DVDs, downloadable audio and video recordings, and CDs featuring and promoting entertainment related to films, games, animation and music; Downloadable multimedia files containing artwork, text, audio, video, games, and Internet Web links **<u>relating to entertainment {The term "realting" should be amended to "featuring."},</u>** music, stories, dramatic performances, and non-dramatic performances; Pre-recorded vinyl records featuring music; Motion picture films about **<u>entertainment</u>**, music, stories, dramatic performances, and non-dramatic performances; (Based on Intent to Use) Series of musical sound recordings; Audio recordings featuring music and musical entertainment; Downloadable audio recordings featuring music and musical entertainment; Digital music downloadable from the Internet; Downloadable music files; Downloadable multimedia files containing audio relating to music and musical entertainment; Downloadable multimedia files containing video relating to music and musical entertainment; Video recordings featuring music and musical entertainment; Video recordings featuring

entertainment in the nature of stage performances by a musical artist and entertainer; Downloadable video recordings featuring music and musical entertainment; Downloadable musical video recordings; Downloadable ring tones; Electronic publications, namely, books, booklets and book excerpts **featuring entertainment**, music and musical entertainment recorded on computer media; Downloadable electronic publications in the nature of books, booklets and book excerpts **in the field of entertainment**, music and musical entertainment; Downloadable electronic publications in the nature of songbooks in the field of music; Downloadable computer application software for mobile electronic devices, namely, software for use in downloading and streaming audio and video recordings featuring music and musical entertainment; Downloadable game software; Downloadable computer graphics software; Mobile phone covers; Protective covers and cases for cell phones, laptops and portable media players; Stands for handheld digital electronic devices, namely, mobile telephones, handheld computers, tablet computers, electronic book readers, portable computers, and portable media players; Devices for hands-free use of mobile phones; Earphone accessories, namely, earphone cushions, earphone pads, earphone cases, and earphone extension cords; Earphones and headphones; Loud speakers; Wireless speakers; Sound amplifiers; Camera cases; Spectacle lanyards; Downloadable electronic books **in the field of entertainment,** music and musical entertainment; Downloadable computer application software for mobile electronic devices, namely, software for accessing information about a musical artist and entertainer; Cases for eyeglasses and sunglasses; Lanyards for holding magnetic identity cards

The subject matter "entertainment," shown above in bold and underlined, is unacceptable as indefinite. The particular subject matter requires further specification in order to provide public notice and enable informed judgments concerning likelihood of confusion under 15 U.S.C §1052(d). Generally, the identification should include a particular subject matter. Applicant may consider amending to "musical entertainment."

*International Class 016*: (Based on Intent to Use and 44(b)) Blank writing journals; Stickers; Art prints; Lithographs; Printed posters; Printed calendars; Removable tattoo transfers; Temporary tattoo transfers; Printed greeting cards; Printed sheet music; Printed coloring books; Printed publications, namely, articles, books, booklets, book excerpts, brochures, guides, magazines and pamphlets **in the field of entertainment,** music and musical entertainment; Writing instruments; Bookmarks; Lanyards for name badge holders; (Based on Intent to Use) Printed notebooks; Note paper; Writing paper; Writing paper pads; Stationery; Decals; Decorative decals for use as home decor; Lithographic prints; Photographic prints; Art paper; Artists' brushes; Paint brushes; Painters' brushes; Artists' pens; Crayons; Pencils; Erasers; Arts and craft paint kits; Painting palettes; Drawing boards; Pen and pencil holders; Pen and pencil cases; Ink stamps; Rubber stamps; Stamp inks; Stamp pads; Stencils; Pens; Pouches for writing instruments; Pen and pencil cases and boxes; Desktop organizers; Boxes of paper or cardboard; Stationery boxes; Coasters of paper; Gift bags; Disposable napkins; Printed song books; Colored pencils; Pencils for painting and drawing; Chalks; Writing implements; Stencil cases; Paper gift tags; Envelopes; Party ornaments of paper

The subject matter "entertainment," shown above in bold and underlined, is unacceptable as indefinite. The particular subject matter requires further specification in order to provide public notice and enable informed judgments concerning likelihood of confusion under 15 U.S.C §1052(d). Identifications for publications must indicate the specific type (e.g., magazines,

newsletters, periodicals, etc.) and the literary subject matter of the publications. Generally, the identification should include a particular subject matter, e.g., biology or history. However, "general human interest" and "general interest" are acceptable subject matters if they are recognized as terms of art in particular industries, such as the magazine and newsletter industries. Applicant may consider amending to "musical entertainment."

*International Class 041*: (Based on Intent to Use and 44(d)) Entertainment services in the nature of live musical performances; Live musical theater performances; Fan clubs; Entertainment services, namely, providing non-downloadable prerecorded music via a website; Providing on-line videos featuring music, not downloadable; Providing on-line newsletters **in the field of entertainment,** music and musical entertainment; Entertainment services, namely, providing temporary use of non-downloadable computer games; Entertainment services, namely, conducting contests; Sweepstake services; Arranging of contests; Entertainment services, namely, providing online puzzle games; Providing a website featuring non-downloadable audio recordings **in the field of entertainment,** music and musical entertainment; Providing a website featuring non-downloadable videos **in the field of entertainment**, music and musical entertainment; Providing a website featuring non-downloadable audio recordings in the field of a musical artist and entertainer; Providing a website featuring non-downloadable videos in the field of a musical artist and entertainer; Providing online non-downloadable videos in the field of music, pre- recorded musical performances, stage performances, public appearances, interviews, news, photographs, and other information and multi-media materials relating to music and musical entertainment; Entertainment services in the nature of a television series in the field of music and the entertainment industry; Entertainment in the nature of theater productions; Theatrical shows provided at performance venues; Entertainment media production services for motion pictures, television and Internet; (Based on Intent to Use) Entertainment, namely, live music concerts; On-line journals, namely, blogs featuring information in the fields of entertainment, music and musical entertainment; Providing online non-downloadable electronic publications in the nature of articles **in the field of entertainment,** music and musical entertainment; Educational services, namely, providing online instruction **in the field of entertainment**, music and musical entertainment; Educational services, namely, conducting training in **the field of entertainment,** music and musical entertainment; Providing online non-downloadable electronic publications in the nature of articles, books, booklets, book excerpts, brochures, guides, magazines and newsletters, **multi-media content,** and audio and video recordings **in the field of entertainment**, music and musical entertainment; Educational services, namely, conducting continuing programs, classes, conferences, coaching, lectures, educational meetings, camps, retreats, seminars, educational summits, educational symposiums, training programs, workshops, self-guided classes and self- guided online courses of instruction in **the field of entertainment**, music and musical entertainment and distribution of course and educational materials in connection therewith; Providing information in the field of music and **entertainmen**t; Entertainment information services, namely, providing information and news releases about a musical artist; Providing entertainment news and information specifically in the field of a musical artist and entertainer via a website; Providing on-line courses of instruction **in the field of entertainment**, music and musical entertainment via a website; **Providing online non-downloadable videos in the field of music, pre-recorded musical performances, stage performances, public appearances, interviews, news, photographs, and other information and multi-media materials relating to a musical artist and entertainer;** Entertainment services, namely, personal appearances by a musician or

entertainer

The subject matter "entertainment," shown above in bold and underlined, is unacceptable as indefinite. The particular subject matter requires further specification in order to provide public notice and enable informed judgments concerning likelihood of confusion under 15 U.S.C §1052(d). Generally, the identification should include a particular subject matter. Applicant may consider amending to "musical entertainment."

As to identifications for publications must indicate the specific type (e.g., magazines, newsletters, periodicals, etc.) and the literary subject matter of the publications. Generally, the identification should include a particular subject matter, e.g., biology or history. However, "general human interest" and "general interest" are acceptable subject matters if they are recognized as terms of art in particular industries, such as the magazine and newsletter industries. Applicant may consider amending to "musical entertainment."

Additionally, note that identifications for educational services, the subject matter or field must be specified with particularity.

As to the reference to "multi-media content," the wording providing multi-media content is considered broad, and not an "electronic publication." The term is indefinite and should be deleted since it is not considered an electronic publication.

Finally, the identification "*Providing online non-downloadable videos in the field of music, pre-recorded musical performances, stage performances, public appearances, interviews, news, photographs, and other information and multi-media materials relating to music and musical entertainment*," requires clarification because it is broad. On the one hand, applicant identifies non-downloadable videos. However, the reference to "other information" is not sufficiently definite in terms of specifying a particular subject matter of the videos. Generally, the identification should include a particular subject matter. In addition, the reference to "multimedia materials" is overly broad. In the identification of goods, applicant must use the common commercial or generic names for the goods, be as complete and specific as possible, and avoid the use of indefinite words and phrases. TMEP §1402.03(a); *see* 37 C.F.R. §2.32(a)(6). If applicant uses indefinite words such as “apparatus,” “components,” “devices,” “materials,” or “parts,” such wording must be followed by “namely,” and a list of each specific product identified by its common commercial or generic name. *See* TMEP §§1401.05(d), 1402.03(a). Here, these could include multimedia files, audio material, video material. The type of multimedia material must be specified as to its common commercial name and the subject matter clearly identified. Note these multimedia materials could be in class 9 or 41. Applicant may amend to specify "multimedia entertainment content."

*General Guidance for Identification Amendments*:

Applicant’s goods and/or services may be clarified or limited, but may not be expanded beyond those originally itemized in the application or as acceptably amended. See 37 C.F.R. §2.71(a); TMEP §1402.06.

The USPTO has the discretion to determine the degree of particularity needed to clearly identify

goods and/or services covered by a mark. *In re Fiat Grp. Mktg. & Corp. Commc'ns S.p.A*, 109 USPQ2d 1593, 1597 (TTAB 2014) (citing *In re Omega SA*, 494 F.3d 1362, 1365, 83 USPQ2d 1541, 1543-44 (Fed. Cir. 2007)). Accordingly, the USPTO requires the description of goods and/or services in a U.S. application to be specific, definite, clear, accurate, and concise. TMEP §1402.01; *see In re Fiat Grp. Mktg. & Corp. Commc'ns S.p.A*, 109 USPQ2d at 1597-98; *Cal. Spray-Chem. Corp. v. Osmose Wood Pres. Co. of Am.*, 102 USPQ 321, 322 (Comm'r Pats. 1954).

"The purpose of the identification of goods [and/or services] is to provide the general population, including consumers and members of the relevant industry, with an understandable description of the goods and services, which is done by using the common commercial name for the goods [and/or services]." *In re Gulf Coast Nutritionals, Inc.*, 106 USPQ2d 1243, 1247 (TTAB 2013) (citing *In re Sones*, 590 F.3d 1282, 1289, 93 USPQ2d 1118, 1124 (Fed. Cir. 2009)). If there is no common, ordinary name for the goods and/or services, applicant should describe the goods and/or services using wording that would be generally understood by the average person. *See Schenley Indus., Inc. v. Battistoni*, 112 USPQ 485, 486 (Comm'r Pats. 1957); *Cal. Spray-Chem. Corp. v. Osmose Wood Pres. Co. of Am.*, 102 USPQ 321, 322 (Comm'r Pats. 1954); TMEP §1402.01.

An in depth knowledge of the relevant field should not be necessary for understanding a description of the goods and/or services. TMEP §1402.01. "[T]echnical, high-sounding verbiage" should be avoided. *Cal. Spray-Chem. Corp. v. Osmose Wood Pres. Co. of Am.*, 102 USPQ at 322.

The USPTO follows the *International Classification of Goods and Services for the Purposes of the Registration of Marks* (also called the "Nice Classification" system), established by the World Intellectual Property Organization, to organize and classify goods and services for the purpose of registering marks. Nice Classification has 45 numbered classes with class headings that describe in broad terms the types of goods and services in each class. *See* 37 C.F.R. §2.85(a); TMEP §§1401.02, 1401.02(a).

An applicant must adopt the appropriate international classification number for the goods and/or services identified in the application. "Proper classification allows for administrative recordkeeping, enables accurate and efficient public searches of USPTO records, and facilitates examination of applications filed with the USPTO by aligning fees with costs." *In re Carlton Cellars, LLC*, 2020 USPQ2d 10150, at *2 (TTAB 2020).

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's online searchable *U.S. Acceptable Identification of Goods and Services Manual*. *See* TMEP §1402.04. For guidance on searching the ID Manual, see "Searching the Trademark ID Manual" located under "Guides, Manuals, and Resources" in the Trademark portion of USPTO.gov, linked here.

**RESPONSE GUIDELINES**

For this application to proceed, applicant must explicitly address each refusal and/or requirement in this Office action. For a refusal, applicant may provide written arguments and evidence against the refusal, and may have other response options if specified above. For a requirement, applicant should set forth the changes or statements. Please see "Responding to Office Actions" and the informational video "Response to Office Action" for more information and tips on responding.

An applicant may check the status of or view documents filed in an application or registration using the Trademark Status and Document Retrieval (TSDR) system. Enter the application serial number or registration number and click on "Status" or "Documents."

**How to respond.** File a **response form to this nonfinal Office action** or file a **request form for an extension of time to file a response**.

/Giselle Agosto/
Giselle Agosto Hincapie
Examining Attorney Advisor
Trademarks - Law Office 118
(571) 272-5868
Giselle.Agosto@USPTO.GOV

RESPONSE GUIDANCE

- **Missing the deadline for responding to this letter will cause the application to abandon.** A response or extension request must be received by the USPTO before 11:59 p.m. **Eastern Time** of the last day of the response deadline. Trademark Electronic Application System (TEAS) system availability could affect an applicant's ability to timely respond. For help resolving technical issues with TEAS, email TEAS@uspto.gov.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon.** If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

**8277122**

# SHOWGIRL

| | |
|---|---|
| **Word Mark** | SHOWGIRL |
| **Goods/Services** | IC 003 US 001 004 006 050 051 052<br>Fragrances; Perfume; Eau de perfume<br>FIRST USE: 2025-05-02. FIRST USE IN COMMERCE: 2025-05-02. |
| **Register** | PRINCIPAL |
| **Serial Number** | 98905117 |
| **Filing Date** | 2024-12-16T00:00:00 |
| **Original Filing Basis** | 1b |
| **Current Filing Basis** | 1a |
| **Publication Date** | 2025-08-19 |
| **Registration Number** | 8277122 |
| **Date Registered** | 2026-05-26 |
| **Owner** | (REGISTRANT) Harlem Brands, Inc. (CORPORATION; Delaware, USA); 2214 8th Avenue, Suite 205, New York, New York 10026, UNITED STATES |
| **Type of Mark** | TRADEMARK |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Live Dead Indicator** | LIVE |
| **Status** | REGISTERED |
| **Attorney of Record** | Stephen P. McNamara |

**Print:** September 22, 2026 9:41 PM


Notify me when back in stock.
CANCEL
NOTIFY ME
RITUALS...
45 results for "perfume"
FILTERS
Sort by:
Bestsellers


Limited Edition
Limited Edition
Last Chance
Travel - Nouwa
$35.00
Nouwa
$89.00
Eau De Parfum
$85.00
L'Éclat
$75.00


Voyage d'Ombre
$75.00
Ciel Rouge
$75.00
Bois Royal
$75.00
Nuit de l'Himalaya
$75.00
Travel - Soleil d'Or
Travel - L'Essentiel
Travel - Bleu Byzantin
Travel - Voyage d'Ombre


$27.00
$27.00
$27.00
$27.00
Last Chance
Last Chance
Travel - Bois Royal
The Iconic Collection, travel eau de parfum, 15 ml
$27.00
Travel - Nuit de l'Himalaya
The Iconic Collection, travel eau de parfum, 15 ml
$27.00
All-over Fragrance Mist
$38.00
Pillow Mist
$35.00
SHOW MORE


CUSTOMER SERVICE
Shipping & Returns
FAQ
Contact
Cookie Policy
Your Privacy Choices
Accessibility Statement
Privacy Policy
Rituals House Rules
WHERE TO FIND US
Our stores
Hotels
Airports
OUR BRAND
About us
Jobs
Franchise
Rituals Newsroom / Press enquiries
Promotions
App
Become a My Rituals member
Vulnerability Disclosure
Profit Pledge
Sustainability Efforts
Certified
NEED HELP? YOU CAN CALL US
Local Tariff
Monday - Friday
CHOOSE YOUR COUNTRY & LANGUAGE
COUNTRY
United States of America (United States of America)
LANGUAGE
English
APPLY SETTINGS
RITUALS APP
App Store
Google Play


Privacy Policy • General Terms • Rituals House Rules • Service • Do Not Sell or Share My Personal Information


Notify me when back in stock.
This product is temporarily sold out online
CANCEL
NOTIFY ME
RITUALS...
Classic Scented Candles
FILTERS
Sort by:
Bestsellers


Online only
Scented Candle
$58.00
Scented Candle
$35.00
Scented Candle
$35.00
Scented Candle
$35.00


Scented Candle
$35.00
FOR MY RITUALS MEMBERS
Receive a gift when you spend another $90.00.
LOG IN OR SIGN UP >
Scented Candle
$35.00
Scented Candle
$35.00
Scented Candle


$35.00
Related categories
CUSTOMER SERVICE
Shipping & Returns
FAQ
Contact
Cookie Policy
Your Privacy Choices
Accessibility Statement
Privacy Policy
Rituals House Rules
WHERE TO FIND US
Our stores
Hotels
Airports
OUR BRAND
About us
Jobs
Franchise
Rituals Newsroom / Press enquiries
Promotions
App
Become a My Rituals member
Vulnerability Disclosure
Profit Pledge
Sustainability Efforts
CHOOSE YOUR COUNTRY & LANGUAGE
COUNTRY
Certified


United States of America (United States of America)
NEED HELP? YOU CAN CALL US
Local Tariff
Monday - Friday
LANGUAGE
English
APPLY SETTINGS
RITUALS APP
App Store
Google Play

https://www.tous.com/us-en/sale/c/4100?utm_source=google&utm_medium=cpc&utm_campaign=tous_us-en_sem_ao_marca-exacta_prf_bco_google_pur&utm_id=_caid16623504360_adsetid138430802567_adid798853123083&utm_term=tous&gclsrc=aw.ds&gad_source=1&gad_campaignid=16623504360&gclid=EAIaIQobChMImPn1xcyDlwMV7XFHAR278xA_EAAYASAAEgLgnvD_BwE

at 09:57:27, 09/22/2026

Free watch case on orders of $450+

TOUS

Search

SALE







Grayish blue Shoulder bag TOUS Back to B...
49.00 ~~$258.00~~ -42%
+4

Small yellow Bowling bag TOUS Back to Ba...
$189.00 ~~$318.00~~ -41%
+5

Medium grayish blue City bag TOUS Back t...
$199.00 ~~$358.00~~ -44%
+3

Grayish blue Minibag TOUS Back to basics
$99.00 ~~$188.00~~ -47%
+3








wn Crossbody bag TOUS Puffy Bear
$119.00 $318.00 -63%
Black Crossbody bag TOUS Puffy Bear
$119.00 $318.00 -63%
Sand-colored Crossbody bag TOUS Puffy B...
$119.00 $318.00 -63%
Taupe-colored Shoulder bag TOUS Puffy B...
$139.00 $358.00 -61%


+2
+5
+1
+1






TOUS


TOUS
Medium taupe Shopping bag TOUS La Rue
Medium black Tote bag TOUS La Rue New
Beige TOUS La Rue New Tote bag
Silver Ring with topaz Color Pills


Silver Color Pills Ring with topaz
75.00 $129.00 -42%
+4
Silver Heart earrings with topaz Color Pills
$249.00 $449.00 -45%
+1
Silver Color Pills Heart necklace with amet...
$75.00 $128.00 -41%
+2
Silver Ring with amethyst Color Pills
$129.00 $229.00 -44%
+4
LOADING...


Frequently Asked Questions
Track your order
Shipping
TOUS Group
Corporate culture
Sustainability
Diamond guide
Pearls guide
Metal guide
MYTOUS Loyalty program
Aftersale service

seasons®

# Owner's Manual

**Part # 269263, 269259, 269287**
**Model # 32091, 32092, 32087**

# Camarillo™
# 52" Ceiling Fan



Exclusively Distributed by:
HD Supply Facilities Maintenance, Ltd.
Atlanta, GA 30339

©2017
Made in China

If you are experiencing difficulty in installation, please contact Customer Service: 1-800-431-3000.

## PACKAGE CONTENTS




Unpack your fan and check the contents. You should have the following items:

**PACKAGE CONTENTS**

1. Trim Ring
2. Canopy
3. Canopy Cover
4. Mounting Bracket
5. Downrod
6. Downrod Pin
7. Downrod Clip
8. Yoke Cover
9. Motor Housing
10. Switch Housing
11. Light Kit
12. Glass Shade (x 4)
13. Candelabra Bulb (x 4)
14. Switch Housing Cap
15. Blade (x 5)
16. Blade Arm (x 5)
17. Hardware Kit
18. Owner's Manual
19. Pull Chain Extension (x 2)

**HARDWARE CONTENTS**

20. Wire Connector (x 3)
21. Mounting Bracket Screw (x 4)
22. Switch Housing Screw (x 3)
23. Closemount Screw (x 3)
24. Set Screw (x 2)

**Note:** Some extra hardware has been included. The quantity listed above is the number required for installation.

## HARDWARE CONTENTS



## DIMENSION REFERENCE




A. 18.41 in. B. 13.00 in. C. 11.25 in. D. 11.61 in. E. 5.83 in.

## MOUNTING OPTIONS

### Tri-mount Options




Choose one of the following mounting options:

**Closemount** method is best suited for ceilings lower than 8 feet. It does not utilize the downrod.

**Downrod Mount** is best suited for ceilings 8 ft. or higher. For taller ceilings you may want to use a longer downrod (not included).

**Angled Ceiling Mount** is best suited for angled or vaulted ceilings. A longer downrod is sometimes necessary to ensure proper blade clearance from the ceiling. If using the angle mount, check to ensure the ceiling angle is not steeper than 16°.

## SAFETY INSTRUCTIONS

READ ALL SAFETY INFORMATION AND INSTALLATION INSTRUCTIONS BEFORE YOU BEGIN INSTALLING THE FAN AND SAVE INSTRUCTIONS.

- All set screws of the fan must be checked and retightened where necessary before installation.
- To reduce the risk of personal injury, do not bend the blade brackets when installing the brackets, balancing the blades or cleaning fan. Do not insert foreign objects in between rotating fan blades.
- Before changing the fan direction, turn off the fan and wait for the fan blades to stop completely.
- If a stationary appliance is not provided with a supply cord and a plug, or with other means for disconnection from the main supply having a contact separation of at least 3 mm in all poles, that means for disconnection must be incorporated in the fixed wiring in accordance with the wiring rules.
- The safeguards provided by these safety instructions and by the separate installation instructions are not meant to cover all possible conditions and situations that may occur. It must be understood that common sense, caution and care are factors which can not be built into this product. These factors must be supplied by the person(s) installing, caring for and operating the fan.
- The fan weight is Net Weight: 18.67 lb (8,49 kg). Be sure the outlet box (not included) is securely attached to the building structure and is marked "Acceptable For Fan Support". Failure to do so can result in serious injury.

**WARNING**

- TO AVOID RISK OF ELECTRIC SHOCK, BE SURE TO SHUT OFF POWER AT THE MAIN FUSE OR CIRCUIT BREAKER BOX BEFORE INSTALLING OR SERVICING THIS FIXTURE. TURNING OFF THE ELECTRICAL POWER BY USING THE LIGHT SWITCH IS NOT SUFFICIENT TO PREVENT ELECTRICAL SHOCK.
- TO REDUCE THE RISK OF INJURY, INSTALL THE FAN SO THAT THE BLADES ARE AT LEAST 7 FEET (2.1 METERS) ABOVE THE FLOOR AND AT LEAST 18 INCHES (0.5 METERS) FROM THE TIP OF THE BLADES TO THE WALL.
- TO REDUCE THE RISK OF FIRE, ELECTRIC SHOCK, OR PERSONAL INJURY, MOUNT TO OUTLET BOX MARKED "ACCEPTABLE FOR FAN SUPPORT" AND USE MOUNTING SCREWS PROVIDED WITH THE OUTLET BOX.
- THE INSTALLATION HAS TO BE IN ACCORDANCE WITH THE NATIONAL ELECTRICAL CODE, ANSI/NFPA 70-1999 AND LOCAL CODES. IF YOU ARE UNFAMILIAR WITH THE METHODS OF INSTALLING ELECTRICAL WIRING, SEEK THE SERVICES OF A QUALIFIED LICENSED ELECTRICIAN.

## ASSEMBLY INSTRUCTIONS




1. Turn OFF the electrical power at the main fuse or circuit breaker.




2. Remove the canopy from the mounting bracket by removing the trim ring and then the two mounting bracket screws from the round holes in the canopy. Then loosen the other two mounting bracket screws from the L-shaped slots. Retain the mounting bracket screws for later. Install the mounting bracket to the outlet box (not included) using the screws and washers provided with the outlet box.

**Warning:** To reduce the risk of fire electric shock, or personal injury, mount to the outlet box marked “acceptable for fan support” and use the mounting screws and washers provided with the outlet box.




3. **CLOSEMOUNT INSTALLATION** (OPTIONAL)

a. Remove the canopy cover from the bottom of the canopy.
b. Place the trim ring on the top of the motor housing with the ring surrounding the yoke.
c. Align the holes in the bottom of the canopy with the screw holes in the top of the motor housing. The larger holes in the canopy will encompass the three pre-installed screws.
d. Secure the canopy to the top of the motor housing with the closemount screws from the hardware bag.
e. Hang the fan on the hook of the mounting bracket.

***Proceed to Step 8.***




4. **DOWNROD MOUNT** - Remove the downrod pin and downrod clip from the downrod. Then, loosen but don’t remove the set screws in the yoke.

## ASSEMBLY INSTRUCTIONS




5. Feed the wires coming from the yoke through the yoke cover, trim ring, canopy and downrod.




6. Insert the downrod into the yoke and reinstall the downrod pin and downrod clip. Then retighten the two set screws.

**Note:** With wiring extending out of the downrod, measure 8 inches of lead wire and cut the excess wire with wire cutters (not included). Then strip 1/2" of insulation from the end of each wire.




7. Lift the downrod into the mounting bracket. Rotate the downrod until the tab in the mounting bracket is seated in the slot in the downrod ball.

**WARNING:** The fan and/or downrod should not rotate in the mounting bracket if installed correctly. Failure to align the slot in the downrod ball with the tab may result in fan falling causing serious injury or death.

# ASSEMBLY INSTRUCTIONS




8. Use wire connectors to connect the fan wires to the power supply wires according to the wiring diagram and the following instructions:

• Connect the green wire from the mounting bracket and downrod to the bare/green (ground) supply wire.
• Connect the white wire from the fan to the white (neutral/common) supply wire.
• Connect the black and blue wires from the fan to the black (live/hot) supply wire.

**Note:** If there is a second hot/power wire coming from the outlet box, connect it to the Blue (light power) fan wire for separate light and fan control.

**Important:** After the connections have been made, the connected wires should be turned upward and pushed carefully up into the outlet box. Place the black and white wire connections on opposite sides of the outlet box.




9. Raise the canopy, ensure the two mounting bracket screws are aligned with the L-shaped slots in the canopy. Then turn the canopy counter clockwise until the mounting bracket screws are completely engaged in the L-shaped slots. Install the two previously removed mounting bracket screws in the round holes. Securely tighten all four mounting bracket screws. Lift the trim ring over the canopy and rotate clockwise until it is locked into right position.




10. Align the holes in the blade over the blade arm pins. Push the pins through the blade and twist the blade arm lock to secure the blade. Repeat for the remaining blades and blade arms.

***To install the fan without the light kit, skip to step 15***.




11. Remove the three switch housing screws from the top edge of the light kit. Then, connect the single-pin connectors from the switch housing to the light kit -- white to white and blue to black.
Secure the light kit to the switch housing using the three switch housing screws.
**Note:** Align the notch in the top of the light kit with the reverse switch.

## ASSEMBLY INSTRUCTIONS




12. Screw the twist-on glass shades onto the sockets of the light kit.




13. Install the E12-base 40W bulbs into the sockets of the light kit.




14. Attach pull chain extensions to the pull chains.

Restore the power at the main fuse or circuit breaker.




15. **INSTALLATION WITHOUT LIGHT KIT** (OPTIONAL)
a. Remove the three switch housing screws from the the top of the light kit.
b. Attach the switch housing cap to the switch housing using the three previously removed switch housing screws. **Note:** Align the notch in the switch housing cap with the reverse switch.
c. Attach the pull chain extension.
d. Restore the power at the main fuse or circuit breaker.

## OPERATING INSTRUCTIONS




1. Use the fan reverse switch, located on the switch housing to optimize your fan for seasonal performance. Using a ceiling fan will allow you to raise your thermostat setting in summer and lower your thermostat setting in winter without feeling a difference in your comfort.

**Note:** Wait for the fan to stop before moving the reverse switch.

**In warmer weather,** push the reverse switch down which will result in downward airflow creating a wind chill effect.

**In cooler weather,** push the reverse switch up which will result in upward airflow that can help move stagnant, hot air off the ceiling area.

## TROUBLESHOOTING

If you have difficulty operating your new ceiling fan, it may be the result of incorrect assembly, installation or wiring. In some cases, these installation errors may be mistaken for defects. If you experience any faults, please check the Troubleshooting section below. If a problem cannot be remedied or you are experiencing difficulty in installation, please contact Customer Service: 1-800-431-3000.

| PROBLEM | SUGGESTED REMEDY |
|---|---|
| 1. Fan does not start | 1. Check main and branch circuit fuses or circuit breakers.<br>2. Check power supply wire connections to fan and switch wire connections in switch housing.<br>**CAUTION:** Make sure main power is turned off before entering canopy.<br>3. Make sure forward/reverse switch pushed completely up or down. Fan will not operate when switch is in the middle.<br>4. Make sure that the wall control is turned ON. |
| 2. Fan is noisy | 1. Make sure all screws in motor housing are snug, but not overtightened.<br>2. Make sure the screws which attach the blade arm to the motor are tight.<br>3. Make sure wire connectors in switch housing are not rattling against each other or against the interior wall of the switch housing.<br>**CAUTION:** Make sure main power is turned off before entering switch housing.<br>4. If using a light kit, be sure the glass shades are finger tight. Check to be sure light bulb are snug in sockets and not touching glass shade(s). If vibration persists from glass, remove glass and install a 1/4 in. wide rubber band on glass neck to act as an insulator. Replace glass and tighten screws against rubber band.<br>5. Some fan motors are sensitive to signals from Solid State variable speed controls. DO NOT USE a Solid State variable speed control. |
| 3. Fan wobbles | 1. Ensure all blades are screwed firmly into blade arms.<br>2. Ensure all blade arms are tightened securely to motor.<br>3. Ensure canopy and mounting bracket are tightened securely to outlet box and outlet box is mounted firmly to ceiling joist.<br>4. Switch one blade with a blade from the opposite side. Or balance the fan using a balancing kit.<br>5. If blade wobble is still noticeable, interchanging two adjacent (side by side) blades can redistribute the weight and possibly result in smoother operation. |
| 4. Light does not work: | 1. Check blue wire from fan to make sure it is connected to hot (black) power supply wire.<br>2. Check for loose or disconnected wires in fan switch housing.<br>3. Check for loose or disconnected wires in light kit.<br>4. Check for faulty light bulbs.<br>**CAUTION:** Make sure main power is turned off before entering switch housing. |

# LIMITED LIFETIME WARRANTY

To obtain Service, please contact Customer Service: 1-800-431-3000.

Model Name: Seasons® Camarillo™ 52" Ceiling Fan
Model No: 32091 - White
32092 - Brushed Nickel
32087 - Polished Brass

Subject to the limitations set forth below, Hong Kong China Electric appliance Company (HKC) warrants the fan motor for this ceiling fan to be free from defects in workmanship and material for the life of the product. Also, subject to the limitations below, HKC warrants all ceiling fan parts ("ceiling fan parts" excludes the motor and parts made in whole or in part with glass) to be free from defects in workmanship and material for a period of one year after the date of purchase by the original purchaser at retail.

All claims must be made by the original purchaser, whether such purchaser purchased the product through a store or contractor. Ceiling fan part defects must be reported within the first year from the date of purchase. Parts made in whole or in part with glass and the finishes of metal and other surfaces are not warranted.

Purchasers are responsible for all costs of removing and reinstalling the product. Any damage to any part caused by ordinary wear and tear, accident, misuse, or improper installation, is not covered by this warranty. HKC assumes no responsibility whatsoever for fan installation. Any service performed by a non-licensed electrician will render the warranty invalid.

HKC's sole responsibility shall be to repair or replace the motor, parts, or product within the terms stated above. HKC shall not be liable for any loss or damage of any kind, including any incidental or consequential damages resulting directly or indirectly, from any breach of warranty, express or implied, or any other failure of this product. Some states do not allow the exclusion or limitation of incidental or consequential damages so this limitation may not apply to you.

If the original purchaser ceases to own the fan, this warranty is voided.

Should the purchaser encounter a problem with your fan related to defects in workmanship or materials within the warranty period associated with the defective part, HKC agrees to replace the defective part without charge, or at its option, to replace the ceiling fan with a comparable or superior model.

HKC's warranties are limited to the written warranties set out in this HKC ceiling fan limited lifetime warranty. All other express and implied warranties, including, without limitation, the implied warranty of fitness for a particular purpose and the implied warranty of merchantability are disclaimed. Some states do not allow the disclaimer of implied warranties, so this disclaimer may not apply to you.

To obtain warranty service, please write down your model number and call Customer Service at 1-800-431-3000. Please have a copy of the receipt as proof of purchase.


US
Stores
COACH
Search
WOMEN
MEN
BAGS
NEW
Coachtopia
Styles for Women
761 Products
Bag Categories
Color
Bag Size
Price
Size
Collection
Sort by
Microsoft Edge
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:02:15 PM


US
Stores
COACH
Search
WOMEN
MEN
BAGS
NEW
Coachtopia
Jewelry for Women
143 Products
Color
Price
Size
Category
Sort by Featured
Search
Microsoft Edge
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:02:48 PM


US
Stores
COACH
Search
WOMEN
MEN
BAGS
NEW
Coachtopia
Perfume & Fragrance for Women
15 Products
Price
Sort by Featured
COACH
cherry
COACH
cherry
COACH
gold
COACH
gold
https://www.coach.com/shop/women/accessories/fragrance
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:03:12 PM


TM Exam Help Gui... TRAM Knownissues-TM E... TRAM-TMReview EPQUERY Producti... Pages - TM IT Syst... OldEPQuery Academy-Sharepoi... TM EXAM Other favorites
TOUS
Search
See all
Sale Earrings
Sale Bracelets
Sale Necklaces
Sale Rings
Sale Pendants
180 of 326 results
Filters
Silver open Ring with stars TOUS Motifs
$41.00 $69.00 -41%
Silver open Ring TOUS Motifs
$58.00 $98.00 -41%
Silver and cultured pearl Ring TOUS Motifs
$51.00 $85.00 -40%
Silver Ring with stars TOUS Motifs
$40.00 $68.00 -41%
https://www.tous.com/us-en/sale/jewelry/c/4145
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:00:49 PM


TOUS
Search
BAGS
See all
Best-selling bags
Audree
Crossbody bags
Small and mini bags
Tote baskets
Shoulder bags
Backpacks and luggage
Leather bags
Bowling bag
60 of 191 results
Filters
NEW IN
edium blue Flap crossbody bag TOUS In...
$288.00
NEW IN
Medium pink Flap crossbody bag TOUS In...
$288.00
NEW IN
Medium beige Flap crossbody bag TOUS I...
$288.00
NEW IN
Medium black Flap crossbody bag TOUS I...
$288.00
Search
https://www.tous.com/us-en/handbags/c/25
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:01:21 PM


TOUS
Search
Results for:
"PERFUME"
Products
Posts
Filters
36 of 36 results
KAOS
LoveMe
TOUS MAN
au de Parfum TOUS KAOS
LoveMe Eau de Parfum Woman
$64.00
Eau De Parfum TOUS
$23.00 $46.00 -50%
Les Colognes Concentrées Eau De Toilette
$65.00
Search
Microsoft Edge
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:01:50 PM


Calvin Klein
Underwear
Women
Men
Collection
Kids
Home
Sale
Women / Apparel
Women's Apparel
Sweaters
Coats + Jackets
Sweatshirts
Jeans
T-Shirts
Category
Color
Size
Collection
Price
All Filters
1,271 Items
Sort By
Featured
Microsoft Edge
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:05:19 PM

Calvin Klein Women Men Kids

## Find A Calvin Klein Store

Search Location

Use our locator to find a location near you or browse our directory.

### Calvin Klein - Leesburg Premium Outlets

241 Fort Evans Road NE, Suite #345, Leesburg, VA, 20176

+1 703 777 9940

More info View directions

### Calvin Klein - Potomac Mills

2700 Potomac Mills Circle, Suite #969, Woodbridge, VA, 22192

+1 703 491 1826

More info View directions

### Calvin Klein - Clarksburg Premium Outlets

22705 Clarksburg Road, Suite #130, Clarksburg, MD, 20871

**https://stores.calvinklein.us/store-locator**
152.0.4191.53
Microsoft Windows 11 Enterprise 24H2 (64-bit Build 26100)
9/22/2026 10:06:13 PM

https://www.rollingstone.com/product-recommendations/lifestyle/best-celebrity-fragrances-by-musicians-1084704/

at 10:12:00, 09/22/2026




RollingStone MUSIC POLITICS TV & MOVIES CULTURE VIBE Got A Tip? Log In Subscribe

RS RECOMMENDS

# NOT ALL CELEBRITY FRAGRANCES SMELL LIKE A CHEAP PROMO PUSH; HERE ARE 9 YOU'LL ACTUALLY WEAR

Star-powered scents can be just as good as designer elixirs, thanks to the olfactory artists entrusted to interpret these namesake perfumes and colognes

By DANIELLE DIRECTO-MESTON

DECEMBER 9, 2020

ADD US AS A GOOGLE PREFERRED SOURCE

ADVERTISEMENT

Ad removed.
Show details

THE LATEST

COURTS

Outkast Sues Ovrkast for



YSL

***If you purchase an independently reviewed product or service through a link on our website, Rolling Stone may receive an affiliate commission.***

Listen to this article now • 6 min listen 1.0x POWERED BY TRINITY AUDIO

When you've got all of the tour merch and collected every item of **random memorabilia**, the next best thing to owning a piece of your favorite artists is smelling like them via a bottle of their signature scent (and we mean that in the most non-***Perfume*** way). But not all celebrity-branded fragrances smell like a cheap promotional perfume to sell in between album cycles. As

**Allegedly Hijacking Its 'Famous, Extremely Valuable' Name**
36 MINUTES AGO

'IT'S HONEST'
**Niko Rubio Will Dive Into Heartbreak and Self-Discovery on Debut Album 'Late Night Swim'**
2 HOURS AGO

HEALTH UPDATE
**East Bay Ray, Dead Kennedys Guitarist, Diagnosed With Parkinson's Disease**
5 HOURS AGO

COURTS AND CRIME
**Man Accused of Murdering 'American Idol' Exec and Husband Still Unfit for Trial, Judge Rules**
7 HOURS AGO

TOP STORIES NEWSLETTER
**A Cultural Force That Transcends Generations**
Enter your email
BY PROVIDING YOUR INFORMATION, YOU AGREE TO OUR TERMS OF USE AND OUR PRIVACY POLICY. WE USE VENDORS THAT MAY ALSO PROCESS YOUR INFORMATION TO HELP PROVIDE OUR SERVICES.

former *New York Times* fragrance critic Chandler Burr **once wrote** in his glowing review of Britney Spears' **Midnight Fantasy**, star-powered scents can be just as good as designer elixirs, thanks to the olfactory artists entrusted to interpret their namesakes' aromatic aesthetic.

Some of the best celebrity perfumes and colognes also happen to make great **gifts** for fans as they're patiently awaiting their idols' next hit. Here, we've rounded up the best musician-approved fragrances for channeling the likes of Jennifer Lopez, Lenny Kravitz, Travis Scott, and other chart-topping pop stars and rappers — read on below.

ADVERTISEMENT





**1. Yves Saint Laurent Y Eau de Toilette**

Yves Saint Laurent has added another Kravitz family member to its lineup. Lenny Kravitz was named as the face of the luxury French house's Y cologne, a citrus-infused woody scent with notes of bergamot, sage, and cedarwood. (Daughter Zoë Kravitz is already a global ambassador of the high-end label's cosmetics and fragrance lines).

The eau de toilette is inspired by YSL's iconic white tee and black jacket and the creative spirit — things that papa Kravitz clearly wears well (in addition to legendary **blanket-like scarves**). In a statement, the guitarist and producer noted that he's "always been a fan of Yves Saint Laurent. Of his work, his aesthetic, his lifestyle, his boldness. He was super eclectic and drew from so many places. I also happened to already wear a lot of Saint Laurent. Always have... It's been part of my lifestyle for so many years."











**EDITOR'S PICKS**


The 250 Greatest Albums of the 21st Century So Far


The 100 Best TV Episodes of All Time


The 500 Greatest Albums of All Time


100 Best Movies of the 21st Century






Yves Saint Laurent & Eau de Toilette, $97, available at Sephora

**2. Ariana Grande R.E.M. Eau de Parfum**

The latest from Ariana Grande's line of fragrances is R.E.M., an "intergalactic dream of femininity and power" with notes of fig, lavender, marshmallow, salted caramel, pear blossom, and sandalwood. To promote the woodsy and floral perfume, the singer released **a short film** animated

by artist Olivier Lescot. The YouTube mini-movie stars Grande as a cosmic superhero who defeats an evil robot with her magical crystals, which just happen to take the form of her newest perfume bottle.






Arianda Grande R.E.M. Eau de Parfum, available at Ulta

**3. Cactus Jack for Byredo Space Rage Travx Eau de Parfum**



It seems that Travis Scott was also drinking the cosmos Kool-Aid when he dreamed up his **recently-launched Cactus Jack collaboration** with cult-favorite Swedish fragrance label Byredo. Sadly, the "Goosebumps" rapper's fans will have to wait to get their hands on his Space Rage candle and perfume, which quickly sold out when the collection was officially announced and dropped on the collaborators' respective websites November 30.




The Cactus Jack for Byredo scent has a base of "atmospheric vapor, dark nebulae," a top note of "cosmic dust, antimatter particles," and a heart of "starlight, the scent of supernova" — which we're guessing won't smell anything at all like opening his **$6 meal collab with McDonald's**. In any case, you'll want to sign up for the waitlist as a restock is expected, or you can find it on **resale sites like StockX here**.








Cactus Jack for Byredo Space Rage Travx Eau de Parfum, $285, available at Byredo




**4. Nude by Rihanna Perfume**

This fruity-floral concoction evokes Rihanna's home of Barbados with a base of musk, sandalwood, and vanilla orchid that's layered with middle notes of gardenia petals, orange blossom, and Sambac jasmine; and guava on on top.









Nude by Rihanna Perfume, $30, available at Perfume.com

**5. Glow by Jennifer Lopez Eau de Parfum**

Arguably the pop star that sparked the celebrity scent boom in the early aughts, J. Lo launched her beauty empire in 2002 with the release of her now-bestselling perfume, Glow. The light floral aroma has sweet orange blossom blended with neroli and grapefruit, resulting in a fresh, citrus finish.











Glow by Jennifer Lopez Eau de Parfum, $23, available at Amazon

**6. Britney Spears Prerogative Eau de Parfum**

While American fans await the U.S. release of the unisex "Ego" edition of Britney Spears' Prerogative perfume (it's currently available in the U.K.), they can spritz on the original floral-woodsy scent that has base notes of amber wood and saffron cream, mid notes of espresso foam and red calla lilly, and sweet top notes of apricot nectar, goji berries, and pink pepper.

**RELATED**

Watch: Garth Brooks to Unveil 'Double Live' Vinyl Release With 'Walmart Live' Show Tonight

Here's Where You Can Find Last-Minute All Things Go Festival Tickets











Britney Spears Prerogative Eau de Parfum, $21, available at Amazon

**7. Lady Gaga Fame Black Fluid Eau de Parfum Spray**

Mother Monster's dark and sensual perfume taps into her avant-garde aesthetic with hints of honey and apricot over florals like belladonna, orchid, and jasmine sambac. Ever the showwoman, Lady Gaga's onyx-hued fragrance becomes invisible when it's sprayed onto the skin. It's sold out at most major brick-and-mortar retailers but still widely available through third-party stores online and on eBay.












Lady Gaga Fame Eau de Parfum Spray, $130, available at Amazon

**8. Usher for Men Cologne**

For those curious about the *eau d'Usher*, here's your answer. The "U Got It Bad" singer's signature cologne is a blend of fresh sea water, bay leaves, nutmeg, and sandalwood, resulting in a crisp and bold fragrance.






Usher for Men Cologne, $20.99, available at Perfume.com

### 9. Shawn Mendes Signature Perfume

The Canadian singer-songwriter's unisex fragrance has fruity top notes of lemon, red apple, and pineapple, followed by sweet middle notes of frangipani, maple, and rose. The base of dulce de leche, cedar, and musk give it a woody body.










Shawn Mendes Signature Perfume, $34, available at Amazon

IN THIS ARTICLE: GIFTS, RS RECOMMENDS

RS RECOMMENDS > LIFESTYLE

## MORE NEWS



EXCLUSIVE EVENT

**Watch: Garth Brooks to Unveil 'Double Live' Vinyl Release With 'Walmart Live' Show Tonight**

By TIM CHAN



TICKETS AND TOURS

**Here's Where You Can Find Last-Minute All Things Go Festival Tickets**

By JONATHAN ZAVALETA



STREAMING GUIDE

**How to Watch Patrick Clancy's '60 Minutes' Interview Online Without Cable**

By ALEXIS MIKULSKI RUIZ








FOOTBALL LIVESTREAM

### How to Watch Today's Commanders vs. Cowboys Football Game Online

By OSCAR HARTZOG



FOOTBALL STREAMING

### How to Watch Today's Vikings vs. Bears Sunday Afternoon Football Game Online

By ALEXIS MIKULSKI RUIZ

READ MORE





ADVERTISEMENT





PMC

## MOST POPULAR

1 VARIETY
Robert Kraft Says Ed Sheeran Is Donating $2 Million to 'Fight This Humanitarian Crisis' in Gaza, and Kraft Is Matching Him: 'All Lives Are Worth Protecting'

## YOU MIGHT ALSO LIKE









2 Hollywood
Patrick Clancy Breaks Silence on '60 Minutes': Where to Stream His First-Ever TV Interview Online

3 sheknows
Owala's Limited-Edition Pokemon Tumblers Are "Finally" Live at Target — Shop All 5 Designs Now

4 Sportico
Steinbrenner Family Selling 4% Yankees Stake in Apollo Deal

Variety
Judge in Paramount-State AGs Case Still Has Questions, Schedules Hearing on Settlement Terms
2 HOURS AGO

sheknows
These Nike Backpacks Are About to Be Everywhere This Fall & They're Not Just for School
5 DAYS AGO

IndieWire
LA's Animation Is Film Festival to Feature Oscar Contenders 'Tangles,' 'Iron Boy,' and More
1 HOUR AGO

Sportico
U.S. Sports' Longest-Tenured Commissioner Isn't Done Yet







GET THE MAGAZINE

GET DIGITAL ACCESS

GIVE A GIFT

CUSTOMER SERVICE

**ROLLING STONE**
- Music
- Politics
- TV & Movies
- Culture
- VIBE
- Staff
- Contact
- Advertise
- RS Shop

**LEGAL**
- Privacy Policy
- Terms of Use
- AdChoices
- PMC Entertainment
- Your Privacy Choices
- Accessibility
- Policy on Anonymous Sources

**FOLLOW US**
- Facebook
- Instagram
- TikTok
- X
- YouTube

**NEWSLETTER SIGNUP**
Enter Your Email
SUBSCRIBE
By providing your information, you agree to our Terms of Use and our Privacy Policy. We use vendors that may also p

**GOT A HOT NEWS TIP?**
We want to hear it. Send us a tip




PMC
Rolling Stone is a part of PMX Global, LLC, a subsidiary of Penske Media Corporation. © 2026 Rolling Stone, LLC. All rights reserved.
Powered by WordPress.com VIP


4FUN
RAV4
LEARN MORE


BY KARGO
14
NEW
CBS
TONIGHT
CBS ORIGINAL
SURVIVOR

THE PERFUME SOCIETY
DISCOVER · EXPLORE · ENJOY

BVLGARI

The history of **BVLGARI** – a name synonymous with precious jewels, striking design, vivid colours (and fine fragrances) – begins in a small Greek village, where **Sotirio Bulgari** fashioned precious objects from silver.




In 1879, Sotirio crossed the Mediterranean from to Naples, then moved on to Rome. It was the humblest of beginnings: he sold his silverware objects in front of the French Academy on the Pincio. Then a Greek merchant offered him the corner of a window in his shop on the via Sistina to showcase his wares. Customers loved them – and in 1884, Sotirio opened his first jewellery store, on that same street.

10 years later, he moved to the Via Condotti – renaming his shop 'The Old Curiosity Shop', from the Dickens novel, to act as a magnet to British and American tourists. It worked – and before long, Sotirio was beginning to make jewellery and accessories, as well as silver objects. But it was Sotirio's sons, Giorgio and Constantino, who fell in love with precious stones, learned the secrets of the trade, and took **Bulgari** to a new level. The Via Condotti store grew, and had a makeover. And after the tribulations of World War II came a turning point, embracing the classicism of the Greeks and Romans and the Italian Renaissance, to carve out the bold, distinctive style that we know Bulgari for today. (The 'V' used in the Bulgari logo is taken from the Latin script that the house adopted as its signature, FYI.)



New York, Paris, Geneva, Monte Carlo. By the 1970s, **Bulgari** was beginning to conquer the world of luxury – and moved into watchmaking, too. Still a family business, by now Paolo and Nicola Bulgari – sons of Giorgio – were working in the business, together with their nephew Francesco Trapani.

To watch a **Bulgari** gem take shape is to understand: this is art, as well as craftsmanship. Each begins with a watercolour or tempura drawing. Then the artisans take over, producing a jewel of polished perfection, sensual smoothness and



roundness, with absolute attention to detail. As with all fashions, there's been an evolution in Bulgari's signature style – but always retaining that focus on intriguing colour combinations, symmetry, and beautiful lines recalling art and architecture. As art historian and critic **Amanda Triossi** has observed, Bulgari 'attracts women with strong personalities.' Boldness, she adds, is probably the jewellery house's most outstanding characteristic.

Of course, there have been many one-offs – commissioned by the wealthiest and most glamorous people in the world. **Bulgari** has created and dedicated unique jewels to **Marilyn Monroe**, **Sophia Loren**, **Lauren Bacall**, **Sharon Stone**, **Charlize Theron**, **Angelina Jolie** and more.

While in Rome shooting 'Roman Holiday' in 1953, **Audrey Hepburn** returned to the **Bulgari** store time and again to buy precious objects, including evening bags, cigarette cases, compacts and a solid gold pin. (She also wore a Bulgari string of pearls in the 1979 film 'Blood Line'.) **Gina Lollobrigida**, meanwhile – that voluptuous and most sensual of Italian actresses – was bewitched by Bulgari jewels, wearing them to dance cheek-to-cheek with Frank Sinatra in 'Never So Few'.

Perhaps most famously of all, **Elizabeth Taylor** and **Richard Burton** sealed their love with an 18.61 carat emerald, surrounded by pear-cut diamonds, later worn by this beautiful brunette movie star on her wedding day. To collect her Oscar for 'Butterfield 8', Taylor wore **Bulgari** again – indeed, Richard Burton once joked that the only Italian word his wife knew was 'Bulgari'.

But in 1992, the launch of their debut scent – **Bulgari Eau Parfumée au Thé Vert** – heralded an exciting new chapter in Bulgari's glimmering history. Created by **Jean-Claude Ellena**, Eau Parfumée au Thé Vert takes the subtlest and finest aromas of green tea, blending citrus notes for a so-refreshing combination that's fresh, delicate and sweet, all at the same time.




After the preceding decade of bold, extravagant scents, **Eau Parfumée au Thé Vert** was – and is – like walking into a still, calm room where you've time to think and breathe again.

An instant classic, this so-cooling scent is loved by women and men alike, and has been described as having 'transparent softness and elegant minimalism', adding: 'for me, it does not so much evoke the aroma of green tea, as it conveys the freshness of morning air, the bitterness of fresh leaves, the sweetness of night-blooming jasmine dissipating as the sun comes up...' (Today, the **Bulgari** tea 'menu' has expanded to include **Thé Blanc**, **Thé Bleu** and **Thé Rouge**.)

**Jasmin Noir** celebrates one of perfumery's most precious flowers – designed to 'express the seductive duality of a woman who at the same time appears fragile but also bewitching and deeply sensual.' In 2011, **Mon Jasmin Noir** unfolded its

petals, playing up jasmine's vibrant lightness and luminous qualities. The **Omnia** collection – with its unique 'link' bottle – offers scents inspired by semi-precious stones, while the ultra-opulent **Le Gemme** collection (see above) also has a very distinct link to **Bulgari**'s gem stones, with their jewel-like, curvaceous bottles. Perfumer **Daniela Andrier** took her inspiration from the colours of the stones – each a hymn to colour, light and emotion.






Renowned perfumer **Alberto Morillas** has worked his magic on many fragrances for the jewellery house, creating the radiantly musk-powered, sensual **Goldea** – which has Cleopatra as its muse – as well as its ultra-feminine incarnation, **Rose Goldea**. 'Bvlgari's perfumes really are jewels. They are set with precious materials and express a unique play of reflections and lights,' he explains.

Morillas has crated many of scents in the jewellery house's growing masculine scent portfolio – including 2018's **Bvlgari Man Wood Essence**. Opening with Italian citrus and coriander, powerful elements of cypress wood and Haitian develop vetiver alongside other – innovative woody extractions that create almost a 'trunk' within the fragrance. Ultimately, it's all is anchored by a warm smokiness in the base (or 'roots'). Morillas observes: 'I love the simplicity of the wood. You have the simplicity of cedarwood, which everybody knows, but also a high-tech technique for extracting the new woods. [The result is] strong, and it stays on your skin and body. Marrying modernity and tradition – that's **Bvlgari**.'

We suggest you discover for yourself, the colours, the light, the smoothness and beauty of **Bvlgari** jewels which have been captured by the world's leading perfumers for all of us to wear and enjoy.

Because whether for men or women, every one, when you take some time to explore them, proves to be really quite a gem...

bulgari.com

FRAGRANCES

Click on fragrances for more information

Please wait - loading perfume house fragrances...

Privacy Policy
Terms & Conditions

© 2026 Copyright Perfume Society

https://en.wikipedia.org/wiki/Diptyque at 10:16:43, 09/22/2026

Wikipedia 25 years of the free encyclopedia

Search Wikipedia Search

Donate Create account Log in

# Diptyque

8 languages

Article Talk Read Edit View history

Contents hide


(Top)
History
Candles
Classic Scents
City Exclusive Candles
Limited Time Releases
Fragrances
Scents
Home Scenting
See also
References
External links


From Wikipedia, the free encyclopedia

*This article is about the fragrance brand. For the composition by Olivier Messiaen, see Diptyque (Messiaen).*

**Diptyque Paris** is a French luxury fragrance brand headquartered in Paris, France. Founded on 34 Boulevard Saint-Germain by a trio of designers: Yves Coueslant (French, a stage designer), Christiane Gautrot (French, an interior designer), and Desmond Knox-Leet (British, a painter). The brand name is derived from the Ancient Greek word Diptych, meaning a two-panel image, a reflection of the designer's early interest in cryptography.[1] The company produces perfumes, colognes, scented candles, skincare, soaps, and oil diffusers.[1] The original boutique still operates at the same location in Paris, and the brand has 124 boutiques worldwide.[2][3]

**Diptyque**



Diptyque's flagship store in Paris, France, 2008

| | |
|---|---|
| **Type** | Private |
| **Industry** | Luxury goods |
| **Headquarters** | Paris, France |
| **Number of locations** | 124 (global) |
| **Key people** | Laurence Semichon (CEO) |
| **Revenue** | €199 million (2024) |
| **Owner** | Manzanita Capital |
| **Website** | Official website |

## History [ edit ]

The company was founded by Yves Coueslant (a stage designer),[4] Christiane Gautrot (an interior designer) and Desmond Knox-Leet (a painter).[3] The first shop they opened sold fabric designs and various decorative items, but by 1963, they had introduced scented candles.[5] By 1968, it came out with its first eau de toilette, called *L'Eau*. *Do Son*, a tribute to Yves Coueslant's memories of Vietnam, and *Philosykos*, a tribute to the fig groves of Greece, cemented Diptyque's reputation as a pioneer in niche perfumery.[6] Over the years, more perfumes and scented candles were developed with perfumers including Olivia Giacobetti, Olivier Pescheux, and Fabrice Pellegrin.[4] The signature black and white labels affixed to the candles were designed and hand-drawn by Knox-Leet.[5] After Knox-Leet's sudden death in 1993, following an operation for appendicitis, Coueslant took over the design of the labels, and Mohamed Lataoui, another friend, became managing director.[4]

Appearance hide

Text
Small
Standard
Large

Width
Standard
Wide

Color
Automatic
Light
Dark

Limited Time Releases

Width

Fragrances
Scents
Home Scenting
See also
References
External links

In 2005, Diptyque was bought by London-based private equity firm Manzanita Capital.[7]

As of 2025, Diptyque operates 124 boutiques worldwide, a significant increase from 70 in 2018. The brand has been expanding its presence in key markets, including the United States, Canada, and the United Kingdom. Notably, Diptyque opened its first Canadian store in Toronto in 2022, followed by locations in Vancouver and Montreal in 2024.[8]

Standard
Wide
Color
Automatic
Light
Dark

## Candles [ edit ]

Diptyque offers an array of candle sizes, small (2.50 oz), classic (6.70 oz), medium (10.60 oz), large (21.20 oz), and very large (51.30 oz). Although, it is worth noting that only bestsellers (baies, rose, figuier, tubérose, feu de bois, and ambre) are in the medium, large and very large sizes.

### Classic Scents [ edit ]

- Baies
- Figuier
- Citronelle
- Rhubarbe
- Shiso
- Café
- Roses
- Ortie
- Feu de Bois
- Santal
- Vanille

Limited Time Releases
Fragrances
Scents
Home Scenting
See also
References
External links

Width
Standard
Wide
Color
Automatic
Light
Dark

### City Exclusive Candles [ edit ]

- Paris
- New York
- London
- Tokyo
- Hong Kong
- Shanghai
- Berlin
- Miami Beverly Hills

- Tokyo
- Pekin (Bejing)
- Seoul
- Milan

### Limited Time Releases [ edit ]

- Pinède (2026 Summer)
- Fleur de Cerisier (2026 Spring)


Limited Time Releases
Fragrances
Scents
Home Scenting
See also
References
External links


Width
Standard
Wide
Color
Automatic
Light
Dark

## Fragrances [ edit ]

### Scents [ edit ]


Products on display at Diptyque


Candles on display at Diptyque

- L'Eau (by Norbert Bijaoui, 1968)
- Vinaigre de Toilette (1973)[4]
- L'Eau Trois (1975)[4]
- Virgilio (1990)[4]
- Philosykos (by Olivia Giacobetti, 1996)[9]
- Eau des Sens (by Olivier Pescheux)[10]
- Tam Dao (2003)[4]
- Do Son (2004)[4]
- Eau de Tarocco (by Olivier Pescheux, 2008)[11]
- L'Ombre dans l'Eau
- L'Autre
- Eau Rose
- Figuier
- Fleur de Peau (2018)
- Eau Duelle
- Eau Capitale
- Orphéon
- Tempo
- L'eau Papier
- Eau de Minthé
- Olène


Limited Time Releases
Fragrances
**Scents**
Home Scenting
See also
References



Width
Standard
Wide
Color
Automatic

External links

- Eau Mohéli (by Olivier Pescheux)[10]
- Eau Nabati
- Vetyverio
- 34 Boulevard Saint Germain (by Olivier Pescheux)[10]
- Oyédo
- Benjoin Boheme (by Olivier Pescheux)
- Eau Rihla[12]

Light
Dark

## Home Scenting [ edit ]

Diptyque offers several other various forms of home scenting apart from their classic candle, such as, reed diffusers, room sprays, car diffusers, and an hourglass diffuser.

Limited Time Releases
Fragrances
Scents
**Home Scenting**
See also
References
External links

## See also [ edit ]

- Boy Smells
- Byredo
- Le Labo
- Francis Kurkdjian
- List of perfumes

Width
Standard
Wide
Color
Automatic
Light
Dark

## References [ edit ]

1. ^ a b The Untold Story Behind Paris's Most Charming Boutique *The Wall Street Journal*, Aleksandra Crapanzano, June 21, 2018.
2. ^ "Diptyque Stores". Archived from the original on 2021-12-19. Retrieved 2021-05-21.
3. ^ a b Dodds, Rosanna (2024-05-08). "Maison Diptyque lands in London". *Financial Times*. Retrieved 2024-10-31.
4. ^ a b c d e f g h Lyall, Joanna (2013-11-18). "Yves Coueslant obituary". *The Guardian*. ISSN 0261-3077. Retrieved 2024-10-31.
5. ^ a b Greenbaum, Hilary (2011-03-17). "Who Made Those Labels?". *The 6th Floor Blog - The New York Times*. Retrieved 2024-10-31.
6. ^ "Diptyque". *luxurydiptyque.ru*. Retrieved 2025-07-17.
7. ^ Thomas, Ellen (2019-08-14). "Diptyque Is Making Scented Tattoos". *WWD*. Retrieved 2021-04-15.
8. ^ Retail Insider, Staff (September 2024). "Diptyque Expanding Across Canada with Stores". *Retail Insider*. Retrieved 2025-04-15.
9. ^ Burr, Chandler (2008-05-29). "Scent Notes | L'Eau des Hespérides by Diptyque". *T Magazine*. Retrieved 2024-10-31.
10. ^ a b c Salibian, Sandra (2023-07-11). "Master Perfumer Olivier Pescheux Dies at 57". *WWD*. Retrieved 2024-10-31.

Limited Time Releases
Fragrances
Scents
Home Scenting
See also
**References**
External links

11. ^ Chandler Burr (28 May 2009), Scent Notes: L'Eau de Tarocco by Diptyque. *T: The New York Times Style Magazine*.
12. ^ "All Fragrances | Diptyque Paris". *Diptyque*. Retrieved 2024-10-31.

Standard
Wide
Color
Automatic
Light
Dark

## External links [ edit ]

- Official website

| V · T · E | Perfumes | [show] |
|---|---|---|
| | Authority control databases | [show] |

Categories: Luxury brands | Perfume houses | French companies established in 1961 | Cosmetics companies of France

This page was last edited on 15 September 2026, at 15:29 (UTC). Page was rendered with Parsoid.

Text is available under the Creative Commons Attribution-ShareAlike 4.0 License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Privacy policy About Wikipedia Disclaimers Contact Wikipedia Legal & safety contacts Code of Conduct Developers Statistics Cookie statement Mobile view

WIKIMEDIA project Powered by MediaWiki