JAYMIE PARKKINEN (S.B. #318394)
jp@prkknn.com
PARKKINEN PC
808 Wilshire Blvd., Suite 200-255
Santa Monica, California 90401
Telephone: (323) 919-3590

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MAREN FLAGG,

Plaintiff,

v.

TAYLOR SWIFT, et al.,

Defendants.

Case No. 2:26-cv-03354-SRM-BFM

Assigned to Hon. Serena R. Murillo

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION AND, IF NECESSARY, FOR LIMITED JURISDICTIONAL DISCOVERY [DKT. 68]**

Date: December 9, 2026
Time: 1:30 p.m.
Place: Courtroom 5D (5th Fl.)
350 W. First Street
Los Angeles, CA 90012

**INTRODUCTION**

Defendants moved to dismiss on the premise that Taylor Swift did nothing in California that matters. Their Motion to Dismiss described as "unsupported" the "allegation that Ms. Swift directed or wrote a music video for an Album track in Los Angeles." Dkt. 57 at 15.[1] Then Swift released a second video. It was filmed in Beverly Hills, on a city permit, with roughly ninety people, seventeen days before this lawsuit was filed. Swift directed it, and she premiered it herself from a stage in Los Angeles. Confronted with the evidence, Defendants have a new position: they now "do not dispute that the 'Patient Zero' and 'The Fate of Ophelia' music videos were filmed in California." Dkt. 78 at 7. What was "unsupported" in June is undisputed in November.

Unable to dispute where the videos were made, Defendants argue that it does not matter. On their account, a defendant's conduct in the forum counts toward personal jurisdiction only if it (i) preceded the First Amended Complaint ("FAC"), (ii) was publicly known when it occurred, and (iii) included the defendant saying the trademark out loud in the forum. *Id.* at 11, 14-15. That is not the law. The first condition misstates Ninth Circuit precedent, and Defendants cite nothing for the second or the third. The first is met in any event: the March video production took place before this action was filed, as Defendants concede in a footnote. *Id.* at 8 n.2.

Defendants also submit a declaration from John R. Dorris, Jr., the head of finance at Swift's management company and a vice president of TAS Rights Management, LLC ("TAS"), who swears that Swift and TAS do not own or control the production companies named on the Beverly Hills permit or employ the producer. Dkt. 78-2 ¶¶ 3, 5-10. No one argued that they do. On the questions that matter—who engaged those companies, who paid them, and who chose to film in California—the declaration is silent. The Court should consider the evidence and, if any question remains, authorize the discovery Plaintiff has requested.

---

[1] "Ex." refers to the exhibits to Plaintiff's Supplemental Declaration, Dkt. 68-2. "Ex. 47" is filed with Plaintiff's Reply in Support of her Second Motion for Leave.

## ARGUMENT

### I. DEFENDANTS' TIMING ARGUMENT FAILS

Defendants' lead argument is that "the Court may not consider conduct occurring after the FAC was filed." Dkt. 78 at 14. As to the video shoot, the argument fails on Defendants' own account: "the Patient Zero video was filmed in March 2026." *Id.* at 8 n.2. The permit was applied for on January 20, 2026, and the City of Beverly Hills issued it on March 10, authorizing "large-scale filming" in Beverly Hills from March 11 to 14. Ex. 31 at 2, 4. Plaintiff filed this action on March 30 and the FAC on June 16. Dkts. 1, 50. Yet Defendants ask the Court to sign an order finding that the events reflected in the supplemental materials "all occurred after Plaintiff filed her FAC." Dkt. 78-1 at 3. Defendants' own brief confirms that assertion is false.

Defendants next argue that the filming does not count because it "was not publicly known" and so "could not have given rise to any FAC claims based upon any consumer confusion." Dkt. 78 at 14. They cite no authority for that test. Purposeful availment "is satisfied if the defendant has taken deliberate action within the forum state." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 603 (9th Cir. 2018) (citation omitted). Personal jurisdiction has no publicity requirement. Contracts are signed, products are manufactured, and business decisions are made out of public view, and each is a forum contact. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:38 n.39 (5th ed.) (among other places, trademark infringement "is deemed to occur ... where the infringing product is made").

Nor is consumer confusion the measure of which forum contacts relate to the FAC. For example, the FAC alleges that Defendants' infringement is willful, FAC ¶¶ 13, 103, and that after the USPTO refused their application, Defendants "expanded that use rather than stopping it." *Id.* ¶¶ 59, 62. The March production reflects both. The USPTO refused to register THE LIFE OF A SHOWGIRL for "[m]usical video recordings" in November 2025. Dkt. 57-12 at 3; Dkt. 72-3 at 3. Four months later, Swift made a music video, in California, under the refused designation. Dkt. 78 at 8

n.2; Ex. 40 at 2. Whether on-set filming itself confused a consumer is not the question. The filming is the willful, expanding use the FAC alleges, and it took place here.

That leaves the premiere. Swift debuted the video at the VMAs in Los Angeles on September 27, 2026, after the FAC was filed. The Court may consider it for two independent reasons. *First*, the premiere carried out a plan made before this action began. On set on March 13, Swift began her effort to premiere the video at the VMAs. Ex. 38 at 03:14–03:33. Defendants' narrow rule would exclude contacts that arise after the FAC, but a premiere planned in California in March 2026 is not such a contact.

*Second*, Defendants' rule is not the Ninth Circuit's. The Ninth Circuit considers "only contacts occurring prior to the event causing the litigation," *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir. 1990), measured "at the time of the events underlying the dispute," *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1171 (9th Cir. 2022); *see* Dkt. 78 at 12-13 (citing both). Defendants read "the event" to mean the filing of the FAC. *Id.* at 14. But the Ninth Circuit reversed a district court for measuring contacts "at the time of the filing of the complaint." *Steel v. United States*, 813 F.2d 1545, 1546, 1549 (9th Cir. 1987) (cited by *Farmers* and *Ratha*). And the event in *Farmers* was a single car accident, complete before suit. 907 F.2d at 912. The FAC alleges no single event. It alleges infringement that "is ongoing and expanding," FAC ¶ 65, and where a defendant continues in the forum the conduct she has been sued for, courts consider it. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1563 (Fed. Cir. 1994) ("In a case involving a continuous tort, it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction."); *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 11 (1st Cir. 2018) (trademark; rule against later contacts arose from a "discrete-in-time tort" that "is unlike the alleged continuing 'tortious' conduct at issue here").

## II. THE CONTACTS ARE SWIFT'S OWN

Defendants recast the Motion as an attempt to pin the conduct of "non-parties"

on Swift and TAS. Dkt. 78 at 16. That is a straw man. The contact is Swift's: she came to Beverly Hills and directed a ninety-person production. Ex. 31 at 4; Ex. 28 at 3.

Defendants' authorities hold that a defendant's relationship with a third party, "standing alone," does not create jurisdiction. Dkt. 78 at 16-17. In those cases, the third party's forum conduct was all the plaintiff had. In *Walden v. Fiore*, the only link to Nevada was that the plaintiffs lived there; the defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." 571 U.S. 277, 289 (2014). In *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, the defendant's contract with a California distributor did not connect the nonresident plaintiffs' claims to California, because they did not allege that the defendant "engaged in relevant acts together with [the distributor] in California." 582 U.S. 255, 268 (2017). Swift, however, traveled to California and directed a large production on location in Beverly Hills, with California production companies. Ex. 31 at 2, 4; Ex. 28 at 3; *Walden*, 571 U.S. at 285 ("[P]hysical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact.").

The production companies matter because they show that these were not one-off visits. Swift has now made two music videos for THE LIFE OF A SHOWGIRL in California, seven months apart, at two selected locations in this District, both with the same Los Angeles production company and the same producer. Ex. 31 at 2; Ex. 32 at 2, 4. Those are "continuing relationships and obligations with citizens of another state" that support jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).

Against this, Defendants offer Mr. Dorris, the head of finance at Swift's management company, who "prepare[s] and maintain[s] business and financial records for Ms. Swift." Dkt. 78-2 ¶ 3. He swears that Swift and TAS do not "own, control, or have any ownership or control interest in" the production companies, and that the producer is not their employee. *Id.* ¶¶ 5-10. Plaintiff never argued otherwise. More importantly, Mr. Dorris rebuts none of the arguments Plaintiff did make or the evidence she offers. He does not deny that Swift directed the video, that she chose the location,

or that she, or someone acting for her, hired and paid these companies. The custodian of Swift's business and financial records would know such things. Because he denies none of them, Plaintiff's evidence stands unrebutted. *Beverly Hills Fan*, 21 F.3d at 1563 (declaration denying direct sales was "not even direct contravention" of allegation of sales through intermediaries).

## III. THE PRODUCTION AND PREMIERE RELATE TO THE FAC

The FAC challenges a brand. It alleges that Defendants adopted THE LIFE OF A SHOWGIRL as a source identifier for recorded music, digital content, and consumer goods, FAC ¶¶ 45, 52, and that TAS applied to register it in fourteen classes. *Id.* ¶¶ 57-58. TAS's application identifies, as relevant here, "[m]usical sound recordings," "[m]usical video recordings," and "live musical performances." Dkt. 57-12 at 3-4. The USPTO refused registration in those classes as likely to be confused with Plaintiff's registered mark and, on September 22, 2026, maintained that refusal. Dkt. 72-3 at 3. The FAC alleges that Defendants' use nonetheless "is ongoing and expanding." FAC ¶ 65. The evidence before the Court is that expansion, and it took place in California. Defendants released additional recordings under the designation, as *The Life of a Showgirl: The Encore*. Ex. 28 at 10. They produced a music video for one of those recordings in Beverly Hills: "Patient Zero" is, in Defendants' own words, "a song on the album *The Life of a Showgirl: The Encore*," Dkt. 78 at 8, and the behind-the-scenes film of the production displays "THE LIFE OF A SHOWGIRL" above "Patient Zero © 2026 Taylor Swift," Ex. 40 at 2, confirming that Defendants know "Patient Zero" is part of THE LIFE OF A SHOWGIRL brand. And Swift premiered the music video from a stage in Los Angeles. Dkt. 78-5 at 3-4.

The law requires no more. Claims need only "arise out of ***or relate to***" the forum contacts. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (emphasis in original). In a trademark case, the related contacts "include the very same promotions, sales, and distribution of which [the plaintiff] complains," *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021), and the claim can "arise out of,

or at the very least relate to, trademark building activities in a forum state." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1094 (9th Cir. 2023). Defendants argue that the filming "could not have given rise to" the claims and that the premiere "cannot be the 'but-for' cause" of them. Dkt. 78 at 14, 15. Those are demands for causation, and the Ninth Circuit has rejected them. *Impossible Foods*, 80 F.4th at 1096-97 (argument that a "causal nexus" is required "squarely contradicts *Ford*'s statement that 'some relationships will support jurisdiction without a causal showing'").

Defendants offer four other responses. None withstands scrutiny.

***"The Life of a Showgirl: The Encore."*** Defendants respond that *The Life of a Showgirl: The Encore* "is not part of the Album pled in the FAC." Dkt. 78 at 8. The FAC challenges Defendants' use of the brand THE LIFE OF A SHOWGIRL on the goods offered under it, which by TAS's account include "[m]usical sound recordings" and a "[s]eries of musical sound recordings." Dkt. 57-12 at 3. And it alleges that the use is "expanding." FAC ¶ 65. An "encore" to *The Life of a Showgirl*, sold as "an expanded edition," is quite literally that alleged expansion. Ex. 28 at 10.

***"Mere attendance."*** Defendants describe Swift's appearance at the VMAs as "mere attendance at an award show." Dkt. 78 at 6. As the Motion showed, on set in Beverly Hills, Swift began her plan to premiere the video on television at the VMAs. Dkt. 68 at 5; Ex. 38 at 03:14–03:33. She then returned to Los Angeles and premiered it there herself. Dkt. 78-5 at 3-4. A six-month effort to get on stage in Los Angeles is not "mere attendance." Defendants' event cases involve defendants who attended an event whose location they did not choose, or who never came to the forum at all. Dkt. 78 at 15. Swift chose the VMAs and came to Los Angeles to debut her video there, and the Ninth Circuit requires nothing more. *See Freestream*, 905 F.3d at 603-04, 607.

***The First Amendment.*** Defendants argue—again—that the video is protected expression. Dkt. 78 at 10, 15. They made that argument in their Motion to Dismiss, Dkt. 57 at 15, 31, and Plaintiff answered it with controlling Supreme Court authority, Dkt. 61 at 28. Defendants had no answer in their reply, and they have none now. *Calder*

*v. Jones*, 465 U.S. 783, 790 (1984) ("reject[ing] the suggestion that First Amendment concerns enter into the jurisdictional analysis").

***The magic words.*** That leaves Defendants' central theme: that Swift "did not speak the words '*The Life of a Showgirl*'" on stage in Los Angeles. Dkt. 78 at 15; *see id*. at 11. They do not cite a single case holding that personal jurisdiction exists only where the defendant says the brand name out loud in the forum. Nor could they. A trademark is used on goods and services; it does not have to be spoken. And Swift came to California to make the goods and to launch them. In any event, Swift has now satisfied even Defendants' invented test. Three weeks after the premiere, on stage in Los Angeles, she introduced her performance as a song from "*The Life of a Showgirl*." Ex. 47 at 00:55–01:06; *see* Pl.'s Reply ISO Second Mot. for Leave, Part II.A.

## IV. THE MOTION IS PROPERLY BEFORE THE COURT

***Local Rule 7-3.*** Defendants ask the Court to disregard certain exhibits because, they say, Plaintiff "never conferred about" the screenshots of the video, the real estate listing, or the materials concerning the production companies. Dkt. 78 at 19. Local Rule 7-3 requires counsel to discuss "the substance of the contemplated motion and any potential resolution." L.R. 7-3. Defendants' own account shows that the parties did exactly that: Plaintiff conferred on Swift's "September 27th appearance at the VMAs, during which the music video for 'Patient Zero' premiered," and on the "March 2026 'Patient Zero' music video shoot." Dkt. 78 at 19. That is the substance of the Motion. Plaintiff's September 28 email told Defendants that "Swift disclosed that the 'Patient Zero' video was shot in March 2026," that "[i]ts setting appears to correspond to a property in Beverly Hills," and that these facts bore on Defendants' position regarding "the one California video shoot then in the record." Dkt. 78-8 at 9. The parties then conferred twice by videoconference. *Id.* at 3-5, 7. Plaintiff's exhibits are the evidence of the substance discussed. The frames from the video and the property listing show the Beverly Hills location, and the permits and production credits connect the March video shoot to Swift. Local Rule 7-3 does not require a party to list its exhibits, and

Defendants did not ask to see them. The one case Defendants cite denied a motion filed with no conference at all, and does not support their argument. *Hand & Nail Harmony, Inc. v. ABC Nail & Spa Prods.*, 2016 WL 9223783, at *2 (C.D. Cal. Aug. 8, 2016).

***Exhibits 32 through 35.*** Defendants object that these exhibits were "publicly available to Plaintiff for many months." Dkt. 78 at 17. That is true of two of them, the August 2025 permit (Ex. 32) and the producer's page for "The Fate of Ophelia" video (Ex. 35). It is not true of the producer's credits (Ex. 33), which list "Patient Zero," a credit that did not exist until the video was released. Regardless, Defendants miss why they are offered. Plaintiff does not offer them as belated proof of the first production. She offers them to identify the second. The Beverly Hills permit was issued under a code title, "Quarry," and does not name Swift. Ex. 31 at 4. What ties it to Swift is that the same production company and the same producer worked on "The Fate of Ophelia," which also shows the continuing nature of Swift's contacts with California. Exs. 32-35. Defendants rely on *Shalit v. Coppe*, 182 F.3d 1124, 1132 (9th Cir. 1999) (movant offered no justification for failing to present the evidence earlier). Plaintiff has given her explanation. And Defendants contend that *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), "confirms the point" because the party there "knew of the employee before filing its opposition." Dkt. 78 at 18. Unlike the party in *Provenz*, Plaintiff learned of the March production after she filed her Opposition to the Motion to Dismiss. Defendants' objection is also academic; they no longer dispute that both videos were filmed in California. Dkt. 78 at 7.

## V. DISCOVERY IS WARRANTED IF ANY QUESTION REMAINS

The FAC and the record establish jurisdiction. But if the Court has any doubt, the remedy is discovery, which "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 507 (9th Cir. 2023) (citation omitted). The bar, as Defendants' own authority confirms, is low: a "colorable" basis, meaning "something less than a prima facie showing," or "'some

evidence' tending to establish personal jurisdiction over the defendant." *Jeong v. Nexo Fin. LLC*, 2022 WL 174236, at *15 (N.D. Cal. Jan. 19, 2022) (quoting *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007)). This is not *Yamashita*'s "fishing expedition," where one theory was "farfetched" and the other "specifically denied via sworn statements." 62 F.4th at 508. Plaintiff offers a city permit, Swift's own words, and Defendants' concessions, and no sworn statement denies any of it.

Defendants ask why Plaintiff needs discovery, and depositions in particular, into "publicly available information." Dkt. 78 at 20 n.5. But the facts at issue are not public, and Defendants admit that the March production itself "was not publicly known." *Id.* at 14. How Swift came to film in California is one example. Plaintiff has shown that Swift wrote and directed the California music videos, and a writer and director decides where her work is filmed. FAC ¶ 17; Ex. 28 at 3; Ex. 30 at 2-3. Defendants offer nothing to dispute that. If the Court wants further support, discovery is necessary, and documents alone will not do. Contracts and call sheets will show Swift's involvement in controlling the California productions, but they are unlikely to show how she came to select the Los Angeles Theatre or the Beverly Hills property. Only Swift can answer that. That is why the Motion seeks interrogatories and her deposition in addition to documents, Dkt. 68 at 11-12, and why Defendants' fallback, discovery "limited to at most a small number of document requests," Dkt. 78 at 22 n.7, would exclude the discovery most likely to answer the question.

TAS's role is another. TAS applied to register THE LIFE OF A SHOWGIRL for "[m]usical video recordings," Dkt. 57-12 at 3, and "administers the intellectual property interests of Taylor Swift," Dkt. 78-2 ¶ 3. Two music videos were made in California under that designation, so TAS's role in those productions bears directly on jurisdiction over TAS. Mr. Dorris is a vice president of TAS, Dkt. 78-2 ¶ 3, and neither of his declarations says whether TAS licensed or approved the use of the designation in these productions. The agreements with the California production companies will show whether TAS was a party to, or authorized, the productions, and TAS's

deposition will show how it actually controlled the designation's use in them. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977). These are examples, not the limits, of the request, and they show why Defendants' request to limit jurisdictional discovery to "a small number of document requests" would not, alone, answer the questions that matter. Dkt. 78 at 22 n.7.

Defendants' remaining objections misdescribe the request. They say it concerns "only post-FAC conduct." Dkt. 78 at 20. That is false. The first production, for instance, was in August 2025 and the second in March 2026, both before the FAC.[2] And Defendants object that the request is "Greatly Expanded" from the one in Plaintiff's Opposition. Dkt. 78 at 19. The request is broader because it reaches the production and premiere that Swift disclosed after Plaintiff's Opposition to the Motion to Dismiss was filed. It is more specific because Defendants objected that the first request was "half-baked" and improper because it was not made by motion. Dkt. 63 at 14 & n.7. Plaintiff therefore itemized her request and made it by noticed motion. Dkt. 68 at 11-12. Neither objection is a reason to deny discovery.

**CONCLUSION**

The Court should grant leave to file the Supplemental Declaration and its Exhibits, and consider them in ruling on the Rule 12(b)(2) portion of Defendants' Motion to Dismiss. And if necessary, the Court should authorize jurisdictional discovery.

---

[2] Defendants' cases on post-complaint discovery do not concern personal jurisdiction. *Tincher v. Mullin*, 2026 WL 2797318, at *11-12 (D. Minn. Sept. 18, 2026) (applying Eighth Circuit rule that confines Article III standing to facts existing when the complaint was filed); *Bacardi USA, Inc. v. Young's Mkt. Co.*, 273 F. Supp. 3d 1120, 1124, 1132-33 (S.D. Fla. 2016) (Article III standing).

DATED: November 25, 2026

Respectfully submitted,

PARKKINEN PC

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen

*Counsel for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing memorandum of points and authorities is 10 pages, in compliance with the 10-page limit set forth in Section VII.D of this Court's Standing Order.

DATED: November 25, 2026

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen

*Counsel for Plaintiff*